# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 01-2881

_____

United States of America,　　　　　*
　　　　　　　　　　　　　　　　　*
　　　Defendant - Appellee,　　　　*
　　　　　　　　　　　　　　　　　*　Appeal from the United States
　　　v.　　　　　　　　　　　　　*　District Court for the
　　　　　　　　　　　　　　　　　*　Eastern District of Missouri.
Douglas Lynn Pennington,　　　　　*
　　　　　　　　　　　　　　　　　*
　　　Defendant - Appellant.　　　　*

_____

Submitted:　December 11, 2001

Filed:　April 26, 2002

_____

Before LOKEN and BYE, Circuit Judges, and BOGUE,[*] District Judge.

_____

LOKEN, Circuit Judge.

A warrant search of Douglas Lynn Pennington's rural Missouri property uncovered methamphetamine, precursor chemicals, equipment for manufacturing and distributing methamphetamine, and documents relating to drug transactions. Officers returned to Pennington's property two months later to investigate complaints he had resumed his methamphetamine activities; a search incident to his arrest uncovered methamphetamine, and a warrant search of the property yielded equipment used to

_____

[*]The Honorable ANDREW W. BOGUE, United States District Judge for the District of South Dakota, sitting by designation.

manufacture methamphetamine and containers with methamphetamine residue. Pennington was indicted on three counts of manufacturing and possessing with intent to distribute methamphetamine. The district court[1] denied his motions to suppress evidence seized during the two searches, and for a <u>Franks</u> hearing. Pennington then entered conditional guilty pleas to all three charges, and the district court sentenced him to concurrent 210-month prison terms on each count. He now appeals the court's suppression and <u>Franks</u> rulings. We affirm.

Regarding the initial search, Pennington argues (1) the warrant was invalid because police failed to corroborate information provided by a confidential informant; (2) a <u>Franks</u> hearing is required because of a misleading statement in the search warrant affidavit; and (3) the search of areas other than his home went beyond the scope of the warrant. Regarding the second search, Pennington argues (4) his arrest and the search incident to his arrest were based upon evidence illegally discovered after police entered his home without a warrant; and (5) evidence seized during the subsequent warrant search was the tainted fruit of the earlier illegal entry. We will affirm the denial of a suppression motion "unless we find that the decision is unsupported by the evidence, based on an erroneous view of the law, or the Court is left with a firm conviction that a mistake has been made." <u>United States v. Madrid</u>, 152 F.3d 1034, 1037 (8th Cir. 1998).

## I. The Initial Search.

**Validity of the Warrant.** On June 21, 2000, a person arrested earlier that day for possessing methamphetamine told Trooper Chris Graves that he had been purchasing an eighth ounce of methamphetamine from Pennington every two to three

[1]The Honorable RODNEY W. SIPPEL, United States District Judge for the Eastern District of Missouri, adopting the Report and Recommendation of the Honorable LEWIS M. BLANTON, United States Magistrate Judge for the Eastern District of Missouri.

weeks for over a year; that Pennington was manufacturing methamphetamine; and that Pennington often carried methamphetamine with him in his red truck.

On June 22, the confidential informant (CI) agreed to cooperate with law enforcement officers in a controlled buy and arranged a meeting with Pennington to purchase methamphetamine. While planning the controlled buy, Trooper Graves twice saw Pennington standing next to or driving a red truck. At 8:30 p.m., officers searched the CI's vehicle and gave him two hundred dollars cash. Trooper Graves watched the CI drive to Pennington's residence, pull into the driveway behind Pennington's red truck, exit his car, and walk toward a box trailer near the modular home. Ten minutes later, the CI returned to his car and drove off to their scheduled meeting place, followed by other officers. When Trooper Graves arrived at the rendezvous, the CI said that he had purchased methamphetamine and that Pennington was currently manufacturing methamphetamine in the box trailer. The CI gave Trooper Graves a bag containing a white substance and wet coffee filters containing a brown substance, both of which field-tested positive for methamphetamine. Graves noticed that the CI "reeked" of ether. Trooper Graves prepared a search warrant application and an affidavit setting forth the above information. The application and affidavit were reviewed by the prosecuting attorney and by a circuit court judge, who issued a warrant authorizing a search of Pennington's property later that evening.

1. Pennington argues that the June 22 warrant was invalid because the officers failed to corroborate information provided by the CI. This argument is without merit because, by arranging and monitoring a controlled buy at Pennington's farm, the officers reliably corroborated the CI's information that Pennington was manufacturing and distributing methamphetamine at that location. Moreover, in cooperating with Trooper Graves, the CI implicated himself in criminal activity, which tends to support a finding of probable cause to search. See United States v. Harris, 403 U.S. 573, 583-84 (1971). Thus, Trooper Graves's warrant affidavit gave the issuing magistrate more than sufficient information to conclude there was

probable cause to issue the search warrant, that is, "a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983).

2. Pennington further challenges the June 22 search warrant by arguing he is entitled to a hearing under Franks v. Delaware, 438 U.S. 154, 155-56 (1978), to explore whether Trooper Graves made a knowingly false statement in his warrant affidavit that was necessary to the issuing magistrate's finding of probable cause. In describing the CI's controlled buy, Trooper Graves averred, "After several minutes, the informant exited the Pennington residence and traveled to a predetermined location where he met with [the investigating officers]." At the suppression hearing, Trooper Graves testified that he observed the CI approach the box trailer, not Pennington's modular home. Therefore, Pennington argues that Trooper Graves lied in the warrant affidavit when he said he saw the CI exit the residence.

Trooper Graves's suppression testimony was very clear: "My definition of the residence would be the modular home, the box trailer, [and] the other out buildings on the property." Using Graves's definition of Pennington's residence, his warrant affidavit was not false in stating that the CI "exited the Pennington residence" and proceeded to his rendezvous with the investigating officers. And certainly this is not the strong initial showing of deliberate falsehood that a defendant must make to warrant a Franks hearing. See United States v. Ozar, 50 F.3d 1440, 1445 (8th Cir.), cert. denied, 516 U.S. 871 (1995). Moreover, whether the controlled buy occurred in the box trailer or in the modular home did not affect whether Graves's affidavit established probable cause to search both structures and the surrounding premises for controlled substances, equipment for drug manufacturing, drug proceeds, and other evidence of drug trafficking crime. See United States v. Reivich, 793 F.2d 957, 963 (8th Cir. 1986). The district court properly denied Pennington's request for a Franks hearing.

**Scope of the June 22 Warrant.** In his affidavit accompanying the June 22 search warrant application, Trooper Graves stated:

> According to the confidential informant every time that he (C.I.) has been at the Pennington residence Doug Pennington has been in possession of methamphetamine. The confidential informant further stated that Pennington manufactures methamphetamine. Some of the manufacturing stages are done at the Pennington residence in a box trailer located on the north side of the modular home. According to the confidential informant Pennington often carries methamphetamine in his personal vehicle.

The warrant -- also drafted by Trooper Graves -- provided:

> IN RE THE MATTER OF: The residence of Doug Pennington, who resides at 1049 Butler County Road #480 in Butler County, Missouri. The residence is a white modular home that faces East. There is a metal outbuilding on the north side of the residence and a box trailer on the north side of the residence. The home is approximately 3 tenths of a mile north of Highway 67 on Butler County Road #480. The residence sits approximately 150 yards on the west side of County Road #480.
>
> ITEMS TO BE SEARCHED FOR: Controlled substances, imitation controlled substances, drug paraphernalia, items used to manufacture controlled substances and/or monies related to drug sales.
>
> \* \* \* \* \*
>
> NOW THEREFORE IN THE NAME OF THE STATE OF MISSOURI
>
> I, COMMAND that you search the . . . place . . . above described within ten (10) days . . . and if said described property, or any part thereof, be found on said . . . place . . . that said property be seized . . . to be dealt with according to the law.

In executing the June 22 warrant, police officers seized evidence found in Pennington's modular home, in the box trailer, in weeds alongside the metal outbuilding, in the red truck, in a dump truck parked near the box trailer, and buried in a back pasture 250-300 yards from the modular home. Pennington argues that the warrant authorized only a search of his "residence," that is, the modular home. Therefore, the box trailer, the metal outbuilding, the red truck, the dump truck, and anything buried in the back pasture were outside the scope of the warrant, and evidence seized from these parts of the property must be suppressed.

The Fourth Amendment provides that warrants must "particularly describ[e] the place to be searched, and the persons or things to be seized." This particularity requirement "ensures that the search will be carefully tailored to its justifications, and will not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit." Maryland v. Garrison, 480 U.S. 79, 84 (1987). The authority to search granted by any warrant is "limited to the specific places described in it and does not extend to additional or different places." United States v. Alberts, 721 F.2d 636, 639 (8th Cir. 1983).

1. The Box Trailer. The CI's controlled buy clearly gave the issuing magistrate probable cause to authorize a search that included the box trailer. Had the warrant described the place to be searched as "the premises" or "the property" at 1049 Butler County Road 480, it would have authorized a search of any buildings found on those premises for evidence of methamphetamine manufacturing. See United States v. Griffin, 827 F.2d 1108, 1113-15 (7th Cir. 1987), cert. denied, 485 U.S. 909 (1988); United States v. Bonner, 808 F.2d 864, 868 (1st Cir. 1986), cert. denied, 481 U.S. 1006 (1987); United States v. Meyer, 417 F.2d 1020, 1023 (8th Cir. 1969). Instead, the warrant began by identifying the property to be searched as, "The residence of Doug Pennington who resides at 1049 Butler County Road #480," and then stated, "The residence is a white modular home."

Had the description of the property to be searched ended there, it might be a close question whether the first use of the word "residence" should be broadly construed as meaning "premises," consistent with the probable cause showing, or narrowly construed as authorizing only a search of the modular home. But the warrant's description of the property to be searched did not end there. It went on to name three specific buildings on the property -- the "white modular home," "a metal outbuilding on the north side of the residence," and "a box trailer on the north side of the residence." Consistent with Trooper Graves's showing of probable cause, the warrant then commanded a search of the "place . . . above described." When a warrant "specifically mentions" certain structures, it "authorizes a search of these structures and, by implication, any other vehicles, structures, or property not noticeably separate from them." United States v. Schroeder, 129 F.3d 439, 441-42 (8th Cir. 1997). The box trailer was properly searched.

2. The Metal Outbuilding. This structure, too, was specifically mentioned in the warrant and therefore was within the places authorized to be searched. Moreover, methamphetamine and a precursor chemical were found in two closed buckets lying in the weeds outside the metal outbuilding. A warrant to search at a street address includes authority to search the yard. See W. Lafave, SEARCH & SEIZURE: A TREATISE, § 4.10(a) at 654-55 & n.7 (3d ed. 1996).

3. The Red Truck and the Dump Truck. Though these vehicles were not specifically listed in the warrant as places to be searched, "a vehicle found on a premises (except, for example, the vehicle of a guest or other caller) is considered to be included within the scope of a warrant authorizing a search of that premises." Reivich, 793 F.2d at 963; see United States v. Bulgatz, 693 F.2d 728, 730 n.3 (8th Cir. 1982), cert. denied, 459 U.S. 1210 (1983). Here, the warrant affidavit specifically stated that Pennington "often carries methamphetamine in his personal vehicle."

-7-

4. The Buried Underground Camper and Anhydrous Ammonia Tank. Before the June 22 warrant search, the CI told the officers that Pennington had buried an anhydrous ammonia tank in a back field. On June 23, officers followed a foot path away from the box trailer into a field. On the surface, nearly three hundred yards from the modular home, they found a trash bag containing starter fluid cans and used coffee filters, a ventilation pipe protruding from the ground, a wooden pallet covering an entryway, and an aluminum ladder extending down from the entryway into a tunnel. Investigating the tunnel, the officers found an anhydrous ammonia tank next to a camper, both of which were buried twelve feet underground. The tank and camper were not visible from the surface, but there was no lock or door protecting the entryway, and the officers did not see a "no trespassing" sign in the area.

Pennington argues the search of this underground bunker was unlawful because it fell outside the scope of the June 22 warrant. The government responds that no warrant was needed because the "open fields" doctrine justified a warrantless search. We agree the field was outside the curtilage of Pennington's residence and therefore was an open field that could be entered without a warrant. See United States v. Dunn, 480 U.S. 294, 301 (1987); Oliver v. United States, 466 U.S. 170, 180 (1984). But the open fields doctrine only allows a search of what is in plain view in the open field.[2] It does not justify a warrantless search of a man-made enclosure found in an open field. The Supreme Court made that clear in Dunn when it emphasized that the investigating officers looked through the window of a barn that was outside the curtilage, but did not enter the barn until they obtained a warrant.

Applying this distinction, we find the warrantless search of Pennington's underground bunker a very close issue. The officers who discovered its entryway

_____

[2]As explained in Oliver, 466 U.S. at 180 n.11, the Fourth Amendment concept of an "open field" includes "any unoccupied or undeveloped area outside of the curtilage," even if protected by a dense woods.

would have been well advised to seal the surrounding area and apply for a second warrant. But given the location of the underground bunker in an open field, its readily visible entryway with an unprotected ladder facilitating access to the tunnel, and no lock or door impeding access, we conclude the district court did not err in denying this portion of Pennington's motion to suppress.

## II. The Second Search.

On September 6, less than three months after the June 22 search, the sheriff's department acted on complaints that Pennington had resumed manufacturing and distributing methamphetamine at his Butler County Road residence. One neighbor complained there had been heavy traffic day and night at the property, and that people were trespassing across the neighbor's property to access the back of Pennington's property. To investigate, officers went to Pennington's property without a warrant to conduct a "knock and talk."

While the Sheriff met Pennington outside the home, Deputy Scott Johnston stood on the front step outside the home talking to a woman inside who was holding the door open. Johnston smelled pseudoephedrine pills soaking, an odor associated with methamphetamine production. The woman told Deputy Johnston that the man he could see through the front door was Mike Vickery, a name Johnston had recently heard in connection with the manufacture and distribution of methamphetamine. Johnston could see "a purple Crown Royal bag laying within two feet of [Vickery] on the table," a type of bag commonly used to carry or conceal illegal drugs. When Vickery did not respond to Johnston's inquiry, Johnston asked Vickery to throw him the bag, and Vickery complied.

Still outside the house, Deputy Johnston looked in the Crown Royal bag and found small bags of marijuana and methamphetamine. Two officers then entered the house to arrest Vickery. They found evidence of methamphetamine manufacturing

in plain view, arrested Pennington when he entered the house, and discovered a bag of methamphetamine during a search incident to his arrest. The officers then obtained and executed a search warrant for the property, seizing items used in the manufacture of methamphetamine found in the modular home, in the box trailer, in Pennington's red truck, in the yard near the modular home, and in the yard near the box trailer. These events formed the basis for Count III of the indictment.

Pennington argues that Deputy Johnston had neither a warrant nor valid consent to search the Crown Royal bag and therefore officers entered the Pennington home illegally. The government contends, and the district court agreed, that Vickery had authority to and did in fact voluntarily consent to the search of the Crown Royal bag, that finding narcotics in the bag justified entering the home, and that the drug manufacturing evidence found in plain view inside the home provided probable cause to arrest Pennington and obtain a warrant to search the property. We agree.

"An officer with consent needs neither a warrant nor probable cause to conduct a constitutional search." United States v. Jenkins, 92 F.3d 430, 436 (6th Cir. 1996), cert. denied, 520 U.S. 1170 (1997), citing Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973). Pennington argues that Vickery did not have authority to consent to the search of the Crown Royal bag in Pennington's home. While the record does not reflect whether the Crown Royal bag belonged to Vickery or to Pennington, "[t]he critical facts . . . are not the actual relationship between the consenter and owner, but how that relationship appears to the officer who asked for consent." Jenkins, 92 F.3d at 436. Here, Deputy Johnston testified that the Crown Royal bag was visible through the open front door, lying within two feet of Vickery as he sat on the living room couch. In response to Johnston's request, Vickery picked up the bag and tossed it outside without objection. This was an act of dominion and control that gave Deputy Johnston reason to conclude that Vickery had authority to consent, and had in fact consented, to Johnston's search of the bag. See Frazier v. Cupp, 394 U.S. 731, 740 (1969) (joint user of duffel bag may consent to its search). Therefore, Johnston's

search of the bag was constitutionally justified by the voluntary consent of a person with at least apparent authority to consent.

Deputy Johnston's discovery of drugs inside the Crown Royal bag, together with what he learned executing the June 22 search warrant, and what he smelled soaking in the house, created exigent circumstances justifying the officers' entry into the house to arrest Vickery and to prevent the destruction of drug manufacturing evidence while they obtained a search warrant. See United States v. Ball, 90 F.3d 260, 263 (8th Cir. 1996), citing Michigan v. Tyler, 436 U.S. 499, 509 (1978). Having entered the residence lawfully, the officers could act upon the drug manufacturing evidence in plain view, see, e.g., United States v. Evans, 966 F.2d 398, 400 (8th Cir.), cert. denied, 506 U.S. 988 (1992). That evidence provided probable cause to arrest Pennington, which justified a search of his person incident to the arrest. See Chimel v. California, 395 U.S. 752, 763 (1969). Therefore, we reject Pennington's contention that his arrest and the September 6 search warrant were based upon tainted evidence obtained from an unconstitutional entry into his home.

The September 6 search warrant contained the same description of the property to be searched as the June 22 warrant. Pennington argues the search of areas outside his modular home went beyond the property described in the warrant. We reject this contention for the reasons stated in our discussion of the June 22 warrant search.

The judgment of the district court is affirmed.

BYE, Circuit Judge, concurring in part and concurring in the judgment.

I join the majority's opinion except as to Part II, in which I concur only in its judgment. Part II explains that Deputy Johnston's search of the Crown Royal bag was constitutionally justified by the consent of Mike Vickery, a person who possessed apparent authority to consent. The majority reaches this conclusion because of the

-11-

bag's proximity to Vickery and his act of tossing it to Deputy Johnston without objection. Because I am not convinced the government has demonstrated Vickery possessed apparent authority to consent to the bag's search, I write separately.

The record reflects Deputy Johnston *ordered* Vickery to toss him the Crown Royal bag, an order with which he complied. The act of tossing the bag, the majority explains, "was an act of dominion and control that gave Deputy Johnston reason to conclude that Vickery had authority to consent, and had in fact consented, to Johnston's search of the bag." <u>Ante</u> at 10. The majority culls from Vickery's bare act of compliance *both* authority to consent and consent itself. This I am unwilling to do. Although his acquiescence demonstrates consent to search the bag, it does not demonstrate his authority to consent to its search. In order for Deputy Johnston to have reasonably believed Vickery possessed apparent authority, he would had to have exercised dominion and control of the bag independent of Deputy Johnston's order (not simply in response to it). This is all the more true since Deputy Johnston knew Vickery was a guest in Douglas Pennington's home, and the bag was located on a coffee table in the home. The majority's holding allows Deputy Johnston—and the next police officer who faces a similar situation—to deduce apparent authority from nothing more than proximity to an object and compliance with a demand to see it. This provides officers considerable, perhaps even unbridled, latitude and therefore troubles me.

Despite my disagreement with this portion of the majority opinion, I nevertheless concur in the judgment. I believe exigent circumstances justified Deputy Johnston's entry into the house to arrest Vickery and to prevent the destruction of drug manufacturing evidence while a search warrant was obtained, irrespective of the contents of the Crown Royal bag. While standing on the porch, Deputy Johnston smelled a strong odor associated with the manufacture of methamphetamine—pseudoephedrine pills soaking. Deputy Johnston had participated in the June 22 search of Pennington's property when extensive evidence related to

methamphetamine manufacturing had been seized; he recognized Vickery's name as a participant in methamphetamine trafficking; and he and other officers had heard complaints that Pennington was once again manufacturing methamphetamine. These facts alone allowed the officers to enter the home. Like the majority, I therefore reject Pennington's contention that his arrest and the September 6 search warrant were based upon tainted evidence obtained from an unconstitutional entry into his home.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.