**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 03-4775

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

TERRY W. STEWART,

Defendant - Appellant.

Appeal from the United States District Court for the Western District of North Carolina, at Bryson City. Lacy H. Thornburg, District Judge. (CR-01-11)

Argued: February 2, 2005          Decided: April 14, 2005

Before LUTTIG, WILLIAMS, and GREGORY, Circuit Judges.

Affirmed in part, vacated in part, and remanded by unpublished per curiam opinion.

**ARGUED:** Camille Michel Davidson, THE FULLER LAW FIRM, P.C., Charlotte, North Carolina, for Appellant. Matthew Theodore Martens, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Charlotte, North Carolina, for Appellee. **ON BRIEF:** Gretchen C. F. Shappert, United States Attorney, Charlotte, North Carolina, for Appellee.

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

PER CURIAM:

On May 31, 2001, a grand jury returned a second superseding indictment charging Appellant Terry W. Stewart ("Stewart"), with 37 counts of conspiracy, mail fraud, wire fraud, and money laundering. After a trial in November 2001, in which Stewart appeared pro se, a jury convicted Stewart on 24 of the 37 counts. The district court thereafter sentenced him to 2,100 months (175 years) of imprisonment. Stewart appeals his conviction and sentence. We affirm Stewart's conviction. However, consistent with United States v. Hughes, No. 03-4172, 2005 WL 628224, (4th Cir. March 16, 2005), our recently published opinion giving guidance on the application of United States v. Booker, 125 S. Ct. 738 (2005), we find plain error in sentencing, exercise our discretion to notice the error, vacate the sentence, and remand to the district court for resentencing.

I.

This case involves a "Ponzi" scheme [1] devised and carried out by Phillip Vaughan ("Vaughan"), Phillip Greer ("Greer") and, Stewart. The premise of the scheme was the marketing of an investment opportunity involving what was represented to the

---

[1]A Ponzi scheme is essentially "a phony investment plan in which monies paid by later investors are used to pay artificially high returns to the initial investors," rather than made from the success of a legitimate business venture. United States v. Godwin, 272 F.3d 659, 666 (4th Cir. 2001) (citation omitted).

2

victims as a secret method of trading options and futures in a "risk free" manner that produced consistently large returns and allowed the investment to grow tax free through the use of trusts. These representations were false.

In 1995, Vaughan formed a company named Banyan International Ltd. ("Banyan") to solicit investments from individuals. From 1996 through March 2000, Banyan salesmen sold "note receivables" offering high fixed rates of return to unsophisticated individuals. Proceeds from new investors were used to make lulling payments to prior investors, and to pay money to Banyan insiders, allegedly including Stewart. Banyan owed over 500 investors more than $89 million when the scheme was uncovered. Only $4.4 million was seized from Banyan brokerage accounts.[2]

In 1994, Stewart and his wife, Jeni, began selling private trusts as independent contractors for Commonwealth Trust Company ("Commonwealth"), a California-based company.[3] In the latter part

---

[2]The total amount of principal investment was $56 million, but the amount that the investors thought that their investments had earned when the scheme was uncovered amounted to over $89 million. At Stewart's sentencing, the district court found that Banyan was responsible for laundering approximately $114 million in funds.

[3]Stewart, a decorated Marine Corps veteran, retired from the military in 1991 and thereafter states that he "began to learn things that he did not like about the government that he had served for twenty-six years. He began to study tax issues and learned how wealthy individuals used asset protection devices to protect their assets from taxation and seizure." Appellant's Br. at 21. "As Stewart gained knowledge about asset protection, he wanted to share this information with others," id., which is why he began working with Commonwealth.

of 1996, Stewart met Vaughan and began a business relationship. Stewart, who was not an employee or officer of Banyan, claims that the relationship consisted of mutual referrals. However, the Government maintains that a key component of the marketing of the "note receivables" in the Ponzi scheme was the representation that the earnings on the investments were non-taxable. In this regard, Banyan's investors were told that to render their investment non-taxable, they needed to purchase a "pure trust organization," ("PTO") and were directed to Commonwealth to make the purchase.[4] Commonwealth sold three products to Banyan investors: (1) PTOs, (2) Internationally Business Corporations ("IBCs"), and (3) "Private Company Trusts" ("PCTs").

Stewart offered his services at seminars throughout the country. At these seminars, he advised people how to transfer ownership of personal and business assets into one or more PTOs, IBCs, or PCTs and then issue fabricated liens against the same property to create the appearance that the property had no net value.[5] At some of these seminars, Banyan salesmen spoke, and Stewart promoted the Banyan investment vehicles. Stewart, through

---

[4]Stewart admits that Banyan literature endorsed Stewart and Commonwealth but argues that many of Banyan's investors were not clients of his and purchased their PTOs elsewhere.

[5]During these seminars, Stewart stated that "he hadn't paid taxes in years" because "it's no longer legal to be taxed." J.A. 745. Stewart also stated that because the PTOs were a private contract between private individuals, they were protected by common law and not subject to statutory laws. Id. at 1058-60; 1159.

4

Commonwealth, paid Banyan a $200 referral for people it referred to Stewart.

Stewart charged $2,525 for the purchase of a PTO, which included trust documents from Maricopa County, Arizona and minutes of trustees meetings appointing the purchaser as "managing director" of the trust. The package also included a "trust identification number" to be used in place of a tax identification number. The "trust identification numbers" used the same state prefix and number of digits as tax identification numbers, but were not legitimate.

Vaughan, Greer, and the other co-defendants all pled guilty. Stewart was the only one to proceed to trial. This appeal from Stewart's conviction and sentence follows.

## II.

First, Stewart argues that he did not knowingly and intelligently waive his right to counsel. In the alternative, he argues that the district court judge should have appointed standby counsel given the complexities of his criminal trial. We reject these arguments.

## A.

Determination of a waiver of the right to counsel is a question of law, and we review it de novo. United States v. Singleton, 107 F.3d 1091, 1097 n.3 (4th Cir. 1997). The Supreme Court has held that under the Sixth Amendment a criminal defendant must be afforded the right to counsel, including court-appointed counsel if the defendant is financially unable to retain an attorney to defend himself. Gideon v. Wainwright, 372 U.S. 335, 341 (1963). But the Supreme Court has also made clear that "although courts are commanded to protect the right to counsel zealously, the defendant can waive the right if the waiver is knowing, intelligent, and voluntary." Singleton, 107 F.3d at 1095 (citing Brady v. United States, 397 U.S. 742 (1970); Johnson v. Zerbst, 304 U.S. 458 (1938)).

Courts must take care not to force counsel upon a defendant, because in addition to the right to the assistance of counsel, the Sixth Amendment implicitly provides an affirmative right to self-representation. Faretta v. California, 422 U.S. 806, 807 (1975). To preserve both the right to counsel and the right to self-representation, "a trial court must proceed with care in evaluating a defendant's expressed desire to forgo representation and conduct his own defense." Singleton, 107 F.3d at 1096. Indeed,

> [a] trial court evaluating a defendant's request to
> represent himself must "transverse . . . a thin line"
> between improperly allowing the defendant to proceed pro
> se, thereby violating his right to counsel, and

6

> improperly having the defendant proceed with counsel, thereby violating his right to self-representation. A skillful defendant could manipulate this dilemma to create reversible error.

Fields v. Murray, 49 F.3d 1024, 1029 (4th Cir. 1995) (en banc) (citations omitted).

"The determination of whether there has been an intelligent waiver of the right to counsel must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." Johnson, 304 U.S. at 464. "[W]hether there is a proper waiver should be clearly determined by the trial court, and it would be fitting and appropriate for that determination to appear upon the record." Id. at 465. Thus, "we review the sufficiency of a waiver of the right to counsel by evaluating the complete profile of the defendant and the circumstances of his decision as known to the trial court at the time." Singleton, 107 F.3d at 1097.

We have rejected the proposition that the failure of the trial court to conduct a searching or formal inquiry into the defendant's understanding of his situation and his awareness of the dangers of self-representation is error. Id. at 1097-98. Rather, "the trial judge is merely required to determine the sufficiency of the waiver from the record as a whole rather than from a formalistic, deliberate, and searching inquiry." Id. at 1098 (quoting United States v. Gallop, 838 F.2d 105, 110 (4th Cir. 1988)).

7

B.

Stewart's lack of counsel was discussed at several pre-trial proceedings, including five separate status of counsel hearings. First, at Stewart's initial appearance before the magistrate judge, the judge went through the second superseding indictment, after giving Stewart an opportunity to read it, and asked Stewart if he understood each of the charges against him. J.A. 104-125. Stewart affirmatively stated that he understood each charge. Id. The judge also went through the maximum penalties for each of the charges and Stewart stated that he understood each penalty. Id. The judge then informed Stewart of his right to counsel, appointed or retained, and Stewart stated that his wife was in the process of interviewing attorneys to retain. Id. at 126.

Next, at Stewart's detention hearing, the magistrate judge asked Stewart about the status of his counsel and Stewart stated that he was in the process of interviewing a particular attorney but had not retained him. Id. at 134. The magistrate judge then asked if Stewart wanted to post pone the hearing so that he could have counsel present, but Stewart declined and signed a waiver of counsel form for the purpose of the detention hearing only.[6] Id.

_____

[6]At the conclusion of the hearing, the magistrate judge set a $500,000 unsecured bond for Stewart. J.A. 169. The district court thereafter revoked Stewart's bond and detained him, finding him to be a flight risk. Id. at 215. We affirmed the district court's ruling. United States v. Stewart, 19 Fed. Appx. 46 (4th Cir. 2001).

8

at 134-35.  At the detention hearing before the district court, the district court judge advised Stewart of his right to counsel and asked if he would like counsel appointed for him, but Stewart again declined.  Id. at 214-15.

At Stewart's status of counsel hearing on July 9, 2001, Stewart told the magistrate judge that he was arranging to retain counsel.  Id. at 221-22.  After the magistrate judge stated to Stewart that his best chance of getting an acquittal would be to retain counsel, Stewart stated that he understood.  The magistrate judge then stated to Stewart:

> Well, we need to get something done pretty soon.  And you need to understand that probably Judge Thornburg does not have to wait until you've got a lawyer, and he will wait a reasonable period of time for you to get a lawyer.  But if you don't have a lawyer within a certain period of time, he will not allow the fact that you don't have a lawyer deter the trial at some point from going on.  Do you understand?

Id. at 226.  Stewart stated that he did understand.  Id.

At the second status of counsel hearing on August 7, 2001, the magistrate judge suggested that the court could appoint an attorney until Stewart was able to find the funds to retain an attorney.  Id. at 231.  The magistrate judge stated:  "I worry about you, Mr. Stewart.  A lot of these other folks have got lawyers, and they're talking to the government."  Id.  The magistrate judge told Stewart again that "[b]ut what's going to happen is it's going to come up against the trial date and you're going to go I'm still trying to get a lawyer and I need to postpone it, and they're going to go

9

that's too bad. . . .  Do you understand what I'm saying."  Id. at

232.  Stewart responded: "Well, sir, I feel in some ways that I'm

being constructively denied the counsel of my choice. . . .  I

couldn't make any arrangements to go up and see the attorney . . .

."  Id.  Stewart told the magistrate judge that he would "like to

work a little harder on trying to work things out with [an attorney

in Indianapolis] at this point."  Id. at 233.

At the third status of counsel hearing on August 13, 2001,

Stewart stated that he was still working on getting an attorney and

the magistrate judge stated:

> But I'm saying to you, you need somebody to help carry
> the ball for you in this.  I don't want you to be left
> with - you know, in a weakened position because you have
> chosen not to accept court-appointed counsel and your own
> futile effort to get your own counsel resulting in you
> winding up representing yourself in a disastrous court
> trial.  And it happens sometimes, and people lose those
> things and they want to go up and they say, well, I
> didn't have an attorney of my choice.  And if the court
> has done everything to give you a competent attorney, the
> reason you don't have an attorney of your choice is you
> refused the court-appointed counsel and couldn't hire
> your own, that doesn't get you the win down the road with
> the court of appeals.  In other words, we're doing
> everything we can to give you a lawyer.

Id. at 245-56.  At the fourth status of counsel hearing on August

15, 2001, the magistrate judge asked Stewart again if he wanted a

court-appointed attorney and he stated, "I would like to continue

pro se, sir."  Id. at 253-b.  The magistrate judge cautioned: "I

really think this is a bad mistake to represent yourself like this.

It never works over in federal court. . . . You've got to try to

10

protect yourself with regard to this case and be vocal in court and try your case." Id. at 253-e.

At the fifth, and final, status of counsel hearing on September 13, 2001, the magistrate judge summarized the court's efforts to provide Stewart with counsel and noted that "in spite of the numerous requests by the Court . . . you have chosen not to ask for a court-appointed attorney." Id. at 255. The magistrate judge then told Stewart that the district court judge, Judge Thornburg, had ruled that if Stewart did not request a court-appointed attorney by September 21, he would have to proceed pro se or retain counsel, but that the trial date in November 2001 would not be delayed. Id. Stewart responded that he understood. Id. At a calendar call on November 5, 2001, Stewart made a oral motion for a continuance based on lack of preparation time, but, having already continued the trial once, Judge Thornburg denied that motion. Id. at 298.

C.

In Singleton, we set out the proper analysis for determining if a waiver of counsel was knowing and intelligent. 107 F.3d at 1098-99. As noted, a formal inquiry is not required, rather, an "open court exploration of the defendant's background capabilities and understanding of the dangers and disadvantages of self-representation," is all that is necessary. Id. at 1097-98.

11

Relevant factors include the defendant's appreciation of the charges and potential penalties, the defendant's understanding of the judicial process, and the defendant's educational background. Id. at 1098.

Looking first to the nature of the charges and the potential penalty, Stewart was informed of these at his arraignment. As detailed, the magistrate judge went through each charge and its potential penalty, and Stewart responded that he understood each one. The magistrate judge also, on numerous occasions, expressed to Stewart that this was a complex fraud case that carried the potential for a long sentence. Stewart also responded that he understood this. Thus, Stewart was adequately informed of the charges against him and their penalties.

Next, looking to Stewart's appreciation of the judicial process. Stewart proceeded pro se in several pre-trial hearings on various motions as well as at his status of counsel hearings. In these motion hearings, Stewart observed the Government's attorney make arguments and conduct direct examinations of witnesses. Stewart also conducted cross-examinations of witnesses at these hearings. In addition, throughout the hearings, the magistrate judge reminded Stewart of the Federal Rules of Evidence and Federal Rules of Criminal Procedure that must be followed. Indeed, Stewart participated in the judicial process for nearly sixth months before trial.

Finally, with regard to Stewart's intelligence and education, the magistrate judge and the district court each had ample opportunity to observe Stewart throughout the pretrial hearings. They each questioned him intensively about his decision to proceed pro se. Stewart also had an impressive education and career in the military.[7] In addition, Stewart was well-spoken, respectful, and even well-versed in various aspects of the law during his pretrial hearings, demonstrating his competency and composure.

The complex nature of this fraud case as well as the large nature of the penalties it carried highlight how unfortunate Stewart's decision to proceed pro se really was in this case. However, it is hard to imagine what else the magistrate judge and district court could have done to convince Stewart to proceed with counsel, short of forcing counsel upon him, which would undoubtedly violate his right to self-representation. A review of the record as a whole is replete with evidence that Stewart's decision to forego counsel and proceed pro se was knowing, intelligent, and voluntary. Under such circumstances, his waiver was effective.

---

[7]While in the military, he was awarded two Purple Hearts, a Bronze Star combat "V" for Valor, the Navy Commendation Medal, the Vietnam Cross of Gallantry with Bronze Star, a National Defense Medal, a Vietnam Service Medal, a Vietnam Campaign Medal with 9 clusters, the Presidential Unit Award, the Navy Unit Award, and the Marine Corps Unit Award.

D.

Because Stewart did not request standby counsel or object to the court's failure to appoint standby counsel on its own, we must review the trial court's decision not to appoint standby counsel for plain error. Plain error requires that the party seeking appellate review demonstrate that: there is an error, the error is plain, the error affects substantial rights, and the error seriously affects the fairness, integrity or public reputation of judicial proceedings. Olano, 507 U.S. at 732-37. However, because no error occurred in this case, Stewart does not meet this standard.

No court has held that the Constitution requires it to appoint standby counsel. We have held that "[a]lthough a court may, in its discretion, allow attorney participation [as standby counsel], the Constitution does not mandate it." Singleton, 107 F.3d at 1097 n.2, 1100; see United States v. Lawrence, 161 F.3d 250, 253 (4th Cir. 1998) ("The Sixth Amendment does not require a court to grant advisory counsel to a criminal defendant who chooses to exercise his right to self-representation by proceeding pro se."). While a defendant may certainly be required to accept the assistance of standby counsel over objection, a district court is not required to offer standby counsel, particularly where, as here, no such request is made.

14

III.

Stewart also raises a number of other objections to his conviction. We address each in turn, but find them all without merit.

A.

Stewart argues that the evidence was insufficient to support the finding that he possessed the requisite intent to defraud. Stewart did not move for a Fed. R. Crim. P. 29 judgment of acquittal based on the insufficiency of the evidence. While we have never considered the question of whether a defendant who fails to move for a Rule 29 motion based on insufficiency of the evidence may raise that issue on appeal, the Sixth and Ninth Circuits have each held that a defendant may not. See United States v. Carr, 5 F.3d 986, 991 (6th Cir. 1992) (noting that because defendant failed to make insufficiency arguments to judge either at the close of government's case or after the close of the evidence as a whole, defendant failed to preserve issues for appellate review); United States v. Ward, 914 F.2d 1340, 1346 (9th Cir. 1990) (stating that appellant waived right to challenge the sufficiency of the evidence on appeal by failing to move for a Rule 29 motion during trial on that ground); 2A Charles Alan Wright, Federal Practice and Procedure § 469 (3d ed. 2000) (referring to the "seemingly well-settled doctrine that if no motion for judgment of acquittal was

15

made in the trial court, an appellate court cannot review the sufficiency of the evidence.  And if the defendant asserted specific grounds in the trial court as the basis for a motion for acquittal, he or she cannot assert other grounds on appeal.").  Here, Stewart did make a motion styled a Rule 29 judgment of acquittal, but it was based on grounds of alleged prosecutorial misconduct.  Supp. J.A. 1.  The district court denied that motion, stating that Stewart "makes no argument in his motion concerning the sufficiency of the evidence."  Id. at 12.

Stewart's failure to move for a Rule 29 motion based on the sufficiency of the evidence precludes our review.  As one purpose of a Rule 29 motion is to allow the trial court the opportunity to grant a defendant acquittal when the evidence is insufficient to sustain a conviction, it only works efficiently when the trial court has such an opportunity.  However, even if we were to take the first opportunity to review the sufficiency of the evidence here, the evidence, when taken in the light most favorable to the Government, was such that a reasonable trier of fact could have

found Stewart guilty beyond a reasonable doubt.[8]  <u>United States v.
Tresvant</u>, 677 F.2d 1018, 1021 (4th Cir. 1982).


                                    B.

    During trial, Stewart subpoenaed Vaughan, a co-defendant who

had previously pled guilty, as a potential witness to testify in

his defense.  Vaughan, through counsel, moved to quash the subpoena

on the ground that he would invoke his Fifth Amendment right not to

incriminate himself if called to testify.  The district court thus

quashed the subpoena.  Stewart argues that the district court erred

in quashing the subpoena because Vaughan's plea agreement

specifically stated that he was waiving his right not to be

compelled to incriminate himself.  J.A. 1292.  Alternatively,

Stewart argues that he should have been permitted to introduce

Vaughan's hearsay statements into evidence.

    In <u>Mitchell v. United States</u>, 526 U.S. 314 (1999), the Supreme

Court held that a defendant who waives his Fifth Amendment right to

remain silent by pleading guilty does not thereby waive his right

_____

    [8]With regard to Stewart's intent to defraud, testimony was
presented that Stewart informed investors that attorneys and CPAs
would conclude that the tax benefits he stated that the PTOs
offered were not available but that he believed that the tax
benefits were available.  J.A. 359-60; 601, 1161.  However,
testimony was also presented that Stewart received and ignored
warnings from outside attorneys and CPAs regarding the lack of
legitimacy of his tax advice.  <u>Id.</u> at 890-901; 1056-70; 1152.
Based on these warnings, it was a reasonable for the jury to infer
that Stewart understood that his belief about the tax benefits of
the PTOs was unfounded.

17

to remain silent at his sentencing.  See id. at 326 ("Although a witness has pleaded guilty to a crime charged but has not been sentenced, his constitutional privilege remains unimpaired.").  The Court expressly noted that "a defendant who awaits sentencing after having pleaded guilty may assert the privilege against self-incrimination if called as a witness in the trial of a co-defendant, in part because of the danger of responding to questions that might have an adverse impact on his sentence or on his prosecution for other crimes."  Id. at 327 (internal quotation marks omitted).  Thus, the mere fact that Vaughan had pled guilty did not mean that he no longer possessed a valid fear of further incriminating himself and the district court correctly quashed the subpoena.

Stewart's alternative argument that he should be allowed to introduce Vaughan's hearsay statements under Chambers v. Mississippi, 410 U.S. 284 (1973) is also without merit.  In Chambers, the Supreme Court held that, in certain "circumstances, where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice."  Id. at 302.  At issue in Chambers was the exclusion of certain statements by a non-defendant who had repeatedly admitted to friends and colleagues that he had committed the murder for which the defendant was charged.  Id. at 292-93.  These statements were excluded at trial

18

as hearsay.  Id. at 299.  The Court reversed, finding that because the hearsay statements were "critical evidence" for the defense and the circumstances under which the statements were made "provided considerable assurance of their reliability," their exclusion violated due process.  Id. at 300-02.  We have since held that the rule of Chambers is limited to third-party confessions.  United States v. Young, 248 F.3d 260, 271 (4th Cir. 2001); see Huffington v. Nuth, 140 F.3d 572, 584 (4th Cir. 1998) (applying Chambers only to "exculpatory confessions by third parties").

Because Stewart did not argue to the district court that the hearsay rules were unconstitutional as applied under Chambers, we review the decision for plain error.  See United States v. Dukaqjini, 326 F.3d 45, 59 (2d Cir. 2003) (applying plain error review when appellants failed to preserve objection to Confrontation Clause violation).  In his brief, Stewart fails to identify the specific hearsay statements that he contends were improperly excluded under Chambers, how any such statements qualify as "third party confessions," how such statements were "critical" to his case, or how they were given under circumstances giving "considerable assurance of their reliability."  Under these facts, it was not error for the district court to exclude Vaughan's statements as hearsay.

19

Stewart next challenges the introduction at trial of evidence that, he contends, was obtained during an unlawful search of a "blue shed" located near his residence.[9] He contends that the search of the blue shed was unlawful because the warrant only allowed for the search of his residence, which does not include the outbuildings, and that the blue shed was located on an adjoining, but separate, piece of land. We review the scope of the warrant <u>de novo</u>. <u>United States v. Oloyede</u>, 982 F.2d 133, 138 (4th Cir. 1992).

Here, the warrant authorized the search of the "premises" at 765 Grinder Creek Road, which was identified as the brown "residence and place of business" of Stewart. J.A. 1448. A warrant authorizing the search of certain "premises" implicitly includes authorization to search outbuildings found on those premises. <u>See, e.g.</u>, <u>United States v. Pennington</u>, 287 F.3d 739, 744 (8th Cir. 2002); <u>United States v. Cannon</u>, 264 F.3d 875, 880 (9th Cir. 2001). An affidavit in support of the warrant also may be used to explain an ambiguity in the scope of the warrant. <u>United States v. Wuagneux</u>, 683 F.2d 1343, 1350, n.6 (11th Cir. 1982). The affidavit in this case, submitted in support of the warrant by a financial advisor for the Internal Revenue Service, stated that the scope of the warrant included "any outbuildings and

---

[9]Stewart fails, however, to point to any evidence actually introduced at trial that was seized from the blue shed.

appurtenances thereto." J.A. 1451. Thus, Stewart's claim that the agents exceeded the scope of the warrant fails.

During trial, Judge Thornburg rejected Stewart's second contention, that the blue shed was not located on the land covered by the search warrant. Id. at 1013. We review factual findings on a motion to suppress for clear error. United States v. Jarrett, 338 F.3d 339, 343-44 (4th Cir. 2003). Here, an IRS agent testified at the suppression hearing that he reviewed the county maps at the time of the search and determined that the blue shed was on the parcel of land covered by the warrant. J.A. 718, 728. Given this testimony, it was not clear error for the district court to find that Stewart had not shown that the shed was on the other parcel of land.[10]

D.

Stewart also argues that his rights were violated under Brady v. Maryland, 373 U.S. 83 (1963), because certain bates-stamped documents were missing from boxes that the Government gave him access to for discovery. To establish a Brady violation, a defendant must demonstrate that (1) the prosecutor withheld

---

[10]In addition, even if the shed was on another parcel, any error would not implicate the exclusionary rule because suppression is not required when agents executing a search warrant make an objectively reasonable mistake as to the boundaries of the property that they are authorized to search. See United States v. Patterson, 278 F.3d 315, 318 (4th Cir. 2002).

21

evidence that was favorable to the defendant, either directly or with impeachment value, (2) the prosecutor suppressed the evidence, either willfully or inadvertently, and (3) the evidence must be material. United States v. Vinyard, 266 F.3d 320, 331 (4th Cir. 2001). Because Stewart did not raise this issue below, we review it for plain error. Id. at 324.

Stewart contends that when he looked at the documents that the Government gave him access to, he noticed that several documents were missing from the sequentially numbered documents. However, Stewart stated to the court that he had only looked at "approximately 40 percent of" the documents supplied to him. J.A. 295. He also stated, "I'm not going to go through hundreds of thousands of documents hoping I'm going to stumble across something." Id. at 261. Given that Stewart did not review all the documents that the Government turned over to him, he cannot establish the first element of Brady, that the Government withheld evidence (much less evidence that was exculpatory or impeaching) from him.[11]

---

[11]Stewart also argues that a witness for the Government testified that the witness had been given some information that was favorable to Stewart, but that this information was not turned over to him. Again, without a review of all the documents turned over to him, Stewart cannot establish a violation.

Stewart argues that he was not afforded the opportunity to testify on his own behalf because he was not advised of this right. A defendant in a criminal trial has a constitutional right to testify on his own behalf. Rock v. Arkansas, 483 U.S. 44, 51 (1987). However, we have held that a district court is not required to advise the defendant of his right to testify or obtain an on-the-record waiver of that right. United States v. McMeans, 927 F.2d 162, 163 (4th Cir. 1991); see Sexton v. French, 163 F.3d 874, 881 (4th Cir. 1988) ("[T]he trial court does not have a sua sponte duty to conduct a colloquy with the defendant at trial to determine whether the defendant has knowingly and intelligently waived the right to testify."). Rather, "[t]o waive the right, all the defendant needs to know is that a right to testify exists." McMeans, 927 F.2d at 163. Because Stewart failed to raise this issue below, we review it for plain error. Olano, 507 U.S. at 730.

Here, the record reflects that the district court explicitly informed Stewart of his right to testify. J.A. 934, 1014. Then, after the close of the Government's evidence, Stewart stated that he would have only one witness, Vaughan. Id. at 1268. After Vaughan invoked his Fifth Amendment privilege, the court asked if Stewart had any further evidence and Stewart responded, "No, sir." Id. at 1307. Having been advised by the district court of his

23

right to testify, Stewart's failure to testify is a waiver of that right and his claim thus fails.[12]

F.

Stewart argues that the district court erred in failing to give the jury a "reliance on expert" instruction on the issue of intent to defraud because he contends that the IRS provided erroneous information to him.  Because Stewart did not object to the instructions of the district court or request the reliance on expert instruction, we review his claim for plain error.  United States v. Stitt, 250 F.3d 878, 883 (4th Cir. 2001).

The jury instructions contained an extensive discussion of the intent to defraud.  The instructions specifically advised the jury that "the good faith of a defendant is a complete defense to the charge of wire fraud."  J.A. 1387.  They also stated that "[a] person who acts . . . on a belief or an opinion honestly held is not punishable . . . merely because the belief, [or] opinion turns out to be inaccurate, incorrect, or wrong.  A honest mistake in judgment or an error in management does not rise to the level of

---

[12]Indeed, Stewart cannot claim that he was confused that the district court judge's question to him about having further evidence meant that it was his time to testify.  In Stewart's earlier detention hearing, the magistrate judge asked Stewart, "[D]o you want to put on any evidence today?".  J.A. 149.  Stewart then stated that he "would like to do a presentation," and was thereafter afforded the opportunity to testify on his own behalf.  Id. at 149-50.

intent to defraud." Id. Given that these instructions accurately stated the law with regard to an intent to defraud and expressly advised the jury that good faith was a defense and that a honestly held belief does not equate to an intent to defraud, the district court did not err in failing to give a further "reliance on expert" instruction.

IV.

Finally, Stewart presents challenges to the application of various guideline enhancements to his sentence as well as a Sixth Amendment challenge under Booker. The jury found Stewart guilty on counts of conspiracy, wire fraud, mail fraud, conspiracy to commit money laundering, and money laundering. At sentencing the district court grouped all counts together pursuant to U.S. Sentencing Guideline Manual § 3D1.2(d) and used the offense level for the money laundering counts as the offense level for the group. It calculated Stewart's sentence as follows:

Base level offense for money laundering, § 2S1.1:        23

Enhancement for loss greater than $100,000,000,
§ 2S1.1(b)(2):                                          +13

Enhancement for vulnerable victims, § 3A1.1(b)(1):      +2

Enhancement for large number of vulnerable victims,
§ 3A1.1(b)(2):                                          +2

Enhancement for being an organizer or leader,
§ 3B1.1(a):                                             +4

25

```
Enhancement for abuse of position of trust,
§ 3B1.3:                                                        +2

                                                                ==

Final Offense Level:[13]                                        46
```

The enhancements to Stewart's sentence were based on facts found by the district court, not the jury. With these enhancements, the district court sentenced Stewart to 2100 months, running his sentences consecutively under U.S. Sentencing Guideline Manual § 5G1.2(d).

As Stewart has raised his Booker objection for the first time on appeal, we review this issue under plain error analysis, which our recent decision in Hughes governs. Under Hughes, the district court plainly erred in imposing a sentence on Stewart that exceeded the maximum allowed under the guidelines based on the facts found by the jury alone.[14] Hughes, 2005 WL 628224, at *2. Thus, we vacate Stewart's sentence and remand for resentencing "consistent with the remedial scheme set forth in Justice Breyer's opinion for the Court in Booker." Id.

---

[13]The district court calculated Stewart's sentencing level at 46, but as the highest level on the Sentencing Guideline chart is 43, his offense level is treated as a 43. See U.S. Sentencing Guideline Manual, ch. 5, pt. A, cmt. n.2 (2000).

[14]The Government conceded at oral argument that Stewart's sentence was enhanced on facts not found by the jury or admitted by Stewart.

V.

For the reasons set forth above, the judgment of the district court is

AFFIRMED IN PART,
VACATED IN PART,
AND REMANDED.

27