# United States Court of Appeals
## For the Eighth Circuit

_____

No. 13-1231

_____

United States of America

*Plaintiff - Appellee*

v.

John Joseph Douglas

*Defendant - Appellant*

_____

Appeal from United States District Court
for the District of Minnesota - St. Paul

_____

Submitted: October 25, 2013
Filed: March 11, 2014

_____

Before RILEY, Chief Judge, COLLOTON and KELLY, Circuit Judges.

_____

RILEY, Chief Judge.

A jury convicted John Joseph Douglas of being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(e)(1) based on Douglas's possession of a "sawed-off" shotgun. Douglas appeals the district court's[1] denial of

_____

[1]The Honorable Patrick J. Schiltz, United States District Judge for the District of Minnesota, adopting the report and recommendation of the Honorable Leo I.

his motion to suppress, arguing the search for, and seizure of, the shotgun violated the Fourth Amendment. We affirm.[2]

## I. BACKGROUND

On May 30, 2011, at 12:10 a.m., Mercedes Adams, a rural resident in the town of Aurora, Minnesota, called 911 to report hearing gunshots from a neighboring property. Minutes later, another caller reported hearing multiple gunshots. Two shots can be heard on the second call. Officers from three different law enforcement agencies responded: Deputy Kim Hanegmon of the St. Louis County Sheriff's Office, Officer Kevin Greene of the Hoyt Lakes Police Department, and Lieutenant Ty Techar of the Gilbert Police Department.

When Deputy Hanegmon arrived at Adams's address, Adams reported the shots sounded as though they were coming from a nearby property that had been vacant since the residence burned down several years before. Adams reported seeing two vehicles traveling together toward the property. While speaking with Adams, Deputy Hanegmon heard gunshots.

All three officers headed toward the property Adams identified. The officers later learned the heavily treed property was owned by Douglas's aunt and uncle, who lived in North Carolina. As the officers neared the property, they observed a bonfire through the trees in a grassy clearing near where the house once stood. Remaining in their vehicles for safety, the officers drove down an overgrown grass driveway through the trees to where the fire was burning.

When they reached the bonfire, the officers found two vehicles roughly matching the description Adams had given. The officers also found a ten-year-old

_____

Brisbois, United States Magistrate Judge for the District of Minnesota.

[2]We have jurisdiction under 28 U.S.C. § 1291.

boy and three adult males, including Douglas, a thirty-three-year-old man Deputy Hanegmon knew from prior encounters. Douglas immediately asked the officers to leave, though he readily admitted he did not own the property. Douglas explained his aunt and uncle had given him permission to use the property and asked him to make sure the property was safe and posted with "No Trespassing" signs.

Advising Douglas of the report of gunshots, Deputy Hanegmon asked Douglas where the gun was. Douglas denied having a gun and again demanded that the officers leave because they did not have a search warrant. Douglas even called his aunt, who told Deputy Hanegmon "he wants me to tell you to leave." The other two adult men at the scene also denied the existence of a gun. The officers placed the men in separate patrol cars to secure the scene and ensure everyone's safety.

Officer Greene performed a protective sweep around the fire, noting beer cans, a bottle of vodka, an empty box of ammunition, and several recently fired shell casings. Officer Greene also found two teenage females hiding behind one of the vehicles. The young women acted scared and smelled of alcohol, despite being underage. Like the men, the women initially denied any knowledge of a gun. Deputy Hanegmon placed the women in her patrol car for safety. After additional questioning, the women admitted to Deputy Hanegmon that Douglas had been firing a shotgun just before the police arrived, but stated they did not know where the shotgun was.

While at the scene, the officers learned Douglas was on probation and that the terms of his probation prohibited him from possessing drugs, alcohol, firearms, and ammunition. When Douglas declined to take a breath test as required by the terms of his probation, the officers placed him under arrest for violating his probation.

After Douglas's arrest, Officer Greene continued to try to locate the shotgun the young women described. Deputy Hanegmon and Officer Greene testified they were

concerned a shotgun in an open area presented a public-safety risk. The officers were also concerned there might be other people on the property hidden by the darkness with access to the shotgun.

As Officer Greene searched the thick brush at the edge of the woods, he saw a rusted-out refrigerator frame lying on the ground approximately twenty to twenty-five yards from the fire. Grass and weeds were growing through the refrigerator, which was lying on its back without any doors. As he approached the refrigerator, Officer Greene noticed a shiny black plastic bag with the corner sticking out of a compartment partially covered by a board. Officer Greene moved the board two to five inches and touched the bag, feeling what he believed to be a gun stock. Officer Greene notified Deputy Hanegmon he thought he had found the missing gun.

Deputy Hanegmon contacted St. Louis County Investigator Mark Steel, who directed her to seize the object. After taking photographs, Deputy Hanegmon removed the plastic bag from the refrigerator and unwrapped it, revealing a "sawed-off" shotgun. None of the officers attempted to obtain a warrant during their investigation. At the suppression hearing, Deputy Hanegmon and Officer Greene stated the officers could have secured the scene and obtained a warrant, but did not.

Police later learned the registered owner of the shotgun was the stepfather of one of the other men at the scene. Douglas has consistently denied any ownership or possessory interest in the bag or the shotgun. Indeed, Douglas denied ever having fired or otherwise possessed the shotgun.

On October 4, 2011, a grand jury indicted Douglas for being a felon in possession of a firearm. Douglas moved to suppress evidence of the shotgun. After a November 29, 2011, suppression hearing, the magistrate judge recommended the district court deny the motion. Despite the government's initial concession to the contrary, the magistrate judge found Douglas "had no reasonable expectation of

-4-

privacy in the plastic bag left in the rusted-out refrigerator remnants abandoned in the middle of an open field that had no structures near it." On January 11, 2012, after de novo review, the district court, describing the question as "close," agreed "Douglas did not have a reasonable expectation of privacy in the plastic bag." The district court further concluded, "even if Douglas did have such an expectation, exigent circumstances justified the officers' warrantless search for, and seizure of, the firearm."

On February 10, 2012, a jury convicted Douglas of being a felon in possession of a firearm after hearing trial testimony from witnesses who saw Douglas fire the shotgun. The district court entered judgment and sentenced Douglas to 240 months imprisonment. Douglas timely appealed his conviction.

## II.   DISCUSSION

Douglas challenges the district court's denial of his motion to suppress, arguing the officers' search for, and seizure of, the shotgun violated his Fourth Amendment rights. "In an appeal from a district court's denial of a motion to suppress evidence, this court reviews factual findings for clear error, and questions of constitutional law *de novo*." United States v. Hollins, 685 F.3d 703, 705 (8th Cir. 2012). "We affirm unless the denial of the motion 'is unsupported by substantial evidence, based on an erroneous interpretation of the law, or, based on the entire record, it is clear that a mistake was made.'" United States v. Payne, 534 F.3d 948, 951 (8th Cir. 2008) (quoting United States v. Stachowiak, 521 F.3d 852, 854 (8th Cir. 2008)).

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "Since Katz v. United States, 389 U.S. 347 (1967), the touchstone of [Fourth] Amendment analysis has been the question whether a person

has a 'constitutionally protected reasonable expectation of privacy.'[3]  Oliver v. United States, 466 U.S. 170, 177 (1984) (quoting Katz, 389 U.S. at 360 (Harlan, J., concurring)).  To meet his "burden of proving he had a legitimate expectation of privacy that was violated by the challenged search and seizure," Douglas must establish (1) he himself "asserted a subjective expectation of privacy" "in the place searched or object seized," and (2) his "subjective expectation is objectively reasonable."  United States v. Kiser, 948 F.2d 418, 423 (8th Cir. 1991).  The first question is a question of fact, the second is a question of law.  See id.

In denying Douglas's motion to suppress, the district court determined the open-fields doctrine was relevant to determining whether Douglas had a reasonable expectation of privacy in a plastic bag that "was visible to anyone standing near the refrigerator in the open field," even if the doctrine "in and of itself, did not authorize the warrantless search of the plastic bag."  Cf. United States v. Stallings, 28 F.3d 58, 60 n.3 (8th Cir. 1994) (explaining the open-fields doctrine was "not completely dispositive" where "the real question is not the officers' authority to be upon and search the field but instead their authority to search the zipped tote bag" found in the field).  Under the open-fields doctrine, "an individual may not legitimately demand privacy for activities conducted out of doors in fields" because "an individual has no legitimate expectation that open fields will remain free from warrantless intrusion by government officers."  Oliver, 466 U.S. at 178, 181; accord Hester v. United States, 265 U.S. 57, 59 (1924) ("[T]he special protection accorded by the Fourth Amendment to the people in their 'persons, houses, papers and effects,' is not extended to the open fields.").

The district court aptly analogized Douglas's Fourth Amendment claim to Stallings, in which we determined a criminal defendant did not have a reasonable

_____

[3]Douglas does not make any argument under United States v. Jones, 565 U.S. ___, 132 S. Ct. 945 (2012).

expectation of privacy in a closed tote bag left in a neighbor's open field. Stallings, 28 F.3d at 60-61. The tote bag bore no indicia of ownership, and the defendant took no steps to keep the bag private. Id. Because the defendant "put on no evidence of his possession or control of the bag, his historical use of the tote bag, or his ability or attempts to regulate access to it," we decided the defendant "failed to establish a subjective expectation of privacy." Id.

With respect to objective reasonableness, we explained that "even if we were to assume [the defendant] had a subjective expectation of privacy . . . . [s]ociety would not be 'prepared to accept that expectation as objectively reasonable.'" Id. at 61 (quoting California v. Greenwood, 486 U.S. 35, 39-40 (1988) (holding that the defendants did not have an objectively reasonable expectation of privacy in trash placed at the curb in plastic garbage bags)). We reasoned "any expectation of privacy [the defendant] had [was] not objectively reasonable . . . because 'animals, children, scavengers, snoops, and other members of the public' had access to the tote bag." Id. (quoting Greenwood, 486 U.S. at 40).

The district court conducted the same analysis and reached the same conclusions here: Douglas failed to demonstrate a subjective expectation of privacy, and even if he had, his expectation was not objectively reasonable. In rejecting Douglas's asserted privacy interest, the district court concluded the placement of the plastic bag in the refrigerator was "of little moment" given the condition and location of the refrigerator, which "had no back or front and was rusted through." The district court found persuasive the reasoning from United States v. Ramapuram, 632 F.2d 1149, 1155 (4th Cir. 1980), in which the Fourth Circuit concluded a defendant had no reasonable expectation of privacy in the "concealed interior" of the unlocked trunk of a "junker" car left in an open field on his father's farm because "whatever expectation of privacy attends a closed but unsecured 'effect' generally is diminished where the 'effect' itself is placed in an area totally without the protection of the Fourth Amendment such as in an open field."

The district court emphasized "the gun was placed in a plastic bag (as noted, the type of bag typically used to carry trash), and the plastic bag was placed in a rusted-out, abandoned refrigerator, where the plastic bag was visible to anyone who approached the refrigerator in the open field," just like the tote bag hidden in the "thick underbrush" in Stallings. Noting the plastic bag, like the bag in Stallings, did not "bear any indication that it belonged to . . . Douglas," the district court concluded Douglas failed to adduce any evidence that he owned, possessed, controlled, or used the bag or ever "attempt[ed] to regulate access to it," Stallings, 28 F.3d at 60-61, beyond generically demanding that the officers leave Douglas's aunt and uncle's property.

Douglas challenges the analogy to Stallings. Douglas maintains he had a reasonable expectation of privacy in the contents of the plastic bag hidden in the rusted-out refrigerator because Douglas was the authorized caretaker of his aunt and uncle's property and repeatedly asked the officers to stop searching for the shotgun and leave. In Douglas's view, his aunt and uncle's permission to use their property gave Douglas "a legitimate expectation of privacy in all areas of the land, and items found therein, that were not 'open fields.'" In essence, Douglas asserts a blanket expectation of privacy in everything on his aunt and uncle's property—regardless of his actual interest in, or connection to, the places searched and the object seized.

Douglas urges "too broad a gauge for measurement of Fourth Amendment rights." Rakas v. Illinois, 439 U.S. 128, 142 (1978). That Douglas was "'legitimately on [the] premises' in the sense that" he was ostensibly on his aunt and uncle's property with their permission, though relevant, "is not determinative of whether [he] had a legitimate expectation of privacy in the particular areas . . . searched" and the object seized. Rakas, 439 U.S. at 148 (first alteration in original). "'[E]ven a property interest in premises may not be sufficient to establish a legitimate expectation of privacy with respect to *particular items* located on the premises.'" Oliver, 466 U.S.

at 183 (alteration in original) (emphasis added) (quoting <u>Rakas</u>, 439 U.S. at 144 n.12). Such is the case here.[4]

"Fourth Amendment rights are personal . . . [and] may not be vicariously asserted." <u>Alderman v. United States</u>, 394 U.S. 165, 174 (1969); <u>see</u> <u>also</u> <u>United States v. Salvucci</u>, 448 U.S. 83, 85 (1980) (explaining "that defendants charged with crimes of possession may only claim the benefits of the exclusionary rule if their own Fourth Amendment rights have in fact been violated"). "A person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed." <u>Rakas</u>, 439 U.S. at 134.

Even if we assume Douglas's authorized use of an open field he did not own and his general demands that the officers leave manifested a subjective expectation of privacy, we agree with the district court that Douglas's expectation of privacy was not objectively reasonable.[5] <u>See</u> <u>United States v. Hayes</u>, 551 F.3d 138, 142, 149 (2d

---

[4]While it may be relevant that Douglas was on the property and trying to exercise whatever property right he may have had, if any, <u>see</u> <u>United States v. Skoda</u>, 705 F.3d 834, 837 (8th Cir. 2013), his general protests do not establish a particularized reasonable expectation of privacy under the circumstances of this case. <u>Cf.</u> <u>United States v. Rapanos</u>, 115 F.3d 367, 373 (6th Cir. 1997) ("Although a landowner who is present and attempting to bar entry may have a *subjective* expectation of privacy, the Supreme Court has rejected 'the suggestion that steps taken to protect privacy establish that expectations of privacy in an open field are legitimate.' [<u>Oliver</u>, 466 U.S.] at 182. For constitutional purposes, therefore, a landowner's presence does not differ in consequence from the erection of a fence or 'No Trespassing' sign: none of these actions creates a reasonable expectation of privacy in open fields.").

[5]We also reject Douglas's claim that the district court clearly erred in finding "the bag was visible to anyone standing near the refrigerator in the open field." Notwithstanding Douglas's assertion to the contrary, the record supports the district court's finding that the plastic bag was visible *before* Officer Greene moved the board—which corrodes Douglas's characterization of the rusted-out refrigerator as a

Cir. 2008) (deciding that a defendant had no legitimate expectation of privacy in a closed black bag and its contents left in the thick "scrub brush" outside the curtilage of the defendant's property). "'If a defendant fails to prove a sufficiently close connection to the relevant places or objects searched he has no standing to claim that they were searched or seized illegally.'" United States v. Barragan, 379 F.3d 524, 529-30 (8th Cir. 2004) (quoting United States v. Gomez, 16 F.3d 254, 256 (8th Cir. 1994)).

Douglas failed to adduce any evidence establishing a close personal connection to the plastic bag, the shotgun, or even the refrigerator—such as it was. Douglas takes issue with the district court's determination that the rusted-out refrigerator was abandoned, but Douglas did not present any evidence about who owned, possessed, or used the refrigerator either as a working refrigerator or a make-shift storage space, much less that Douglas himself had ever done so. Douglas presumes his aunt and uncle owned the refrigerator and speculates they might put it to use at some point in the future. But that is pure conjecture. The refrigerator could have just as easily been unlawfully abandoned on the property by a stranger who did not want to pay to take it to the garbage dump. In any event, there is nothing in the record to establish Douglas had any connection at all to the refrigerator as it lay on his aunt and uncle's property. To the extent Douglas's aunt and uncle had an expectation of privacy in the discarded refrigerator on their land, see United States v. Biondich, 652 F.2d 743, 745 (8th Cir. 1981), Douglas cannot vicariously assert their rights. See Alderman, 394 U.S. at 174.

The same is true of Douglas's asserted expectation of privacy in the plastic bag and the shotgun itself—which firearm was registered to the stepfather of one of the other men at the scene. See, e.g., United States v. Randolph, 628 F.3d 1022, 1026 (8th

closed container for Fourth Amendment purposes. See United States v. Ross, 456 U.S. 798, 822-23 (1982) ("[T]he Fourth Amendment provides protection to the owner of every container that *conceals its contents* from plain view.") (emphasis added).

Cir. 2011). Douglas did not adduce any evidence that he had any interest—ownership, possessory, or otherwise—in the plastic bag in which the shotgun was found. To the contrary, rather than present evidence to establish a personal connection to the areas searched and the item seized, Douglas consistently disavowed any ownership or possessory interest in the bag or the shotgun, even going so far as to deny any knowledge of them.[6] Because Douglas "has consistently disavowed any ownership interest in the bag containing the [shotgun], he is precluded from claiming that the bag was searched and its contents seized in violation of his constitutional rights." United States v. Washington, 197 F.3d 1214, 1216 (8th Cir. 1999). The district court did not err in denying Douglas's motion to suppress.[7]

## III. CONCLUSION

We affirm the judgment of conviction.

_____

---

[6]The jury, of course, was free to reject Douglas's denials and convict him of unlawful possession based on the testimony from witnesses who saw Douglas fire the shotgun. Cf. Salvucci, 448 U.S. at 90.

[7]Because we conclude Douglas did not have a reasonable expectation of privacy, we need not decide whether the district court correctly concluded "the officers' search for, and seizure of, the firearm fell within the exigent-circumstances exception to the warrant requirement." See United States v. Williams, 737 F.2d 735, 739 (8th Cir. 1984).