# United States Court of Appeals
## For the Eighth Circuit

_____

No. 14-3184
_____

United States of America

*Plaintiff - Appellee*

v.

Bob Sam Castleman

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Eastern District of Arkansas - Little Rock

_____

Submitted: April 17, 2015
Filed: August 5, 2015

_____

Before MURPHY, COLLOTON, and KELLY, Circuit Judges.

_____

MURPHY, Circuit Judge.

Bob Sam Castleman was charged with conspiracy to manufacture methamphetamine, maintaining drug premises, and conspiracy to possess chemicals and equipment used to make methamphetamine. Some evidence supporting these charges came from a traffic stop in Walnut Ridge, Arkansas and a later search of open

fields on Castleman's property. The district court[1] denied motions to suppress the evidence obtained during these searches. At trial the government also introduced evidence that he had murdered a coconspirator to prevent him from testifying. This testimony was offered over Castleman's objection as evidence of his consciousness of guilt. The jury returned a guilty verdict on all counts. At sentencing the district court found that Castleman had murdered the coconspirator, applied the higher base offense level for first degree murder under U.S.S.G. §§ 2A1.1 and 2D1.1(d)(1), and sentenced him to 40 years imprisonment. Castleman appeals his conviction and sentence, and we affirm.

I.

A.

On April 11, 2011, while Tracy Moore was working at the Farm Service store in Walnut Ridge, Arkansas, he saw a man who had purchased Coleman fuel enter a parked pickup truck. Then he observed a woman leave the same truck, come into the store, and purchase vinyl tubing. Moore was aware that the items purchased could be used to produce methamphetamine and thought the customers' behavior was suspicious so he called the police chief of Hoxie, a neighboring city. He contacted the police in Hoxie rather than Walnut Ridge because in his prior experience they responded more quickly to such calls. Moore provided a description of the pickup truck, its occupants, and the items they had purchased.

Hoxie Police Chief Glen Smith responded to the call and saw a truck matching Moore's description pull out of the Farm Service parking lot. Smith followed the truck and stopped it after he observed it cross over the center line. The stop occurred

---

[1]The Honorable J. Leon Holmes, United States District Judge for the Eastern District of Arkansas.

in Walnut Ridge, and Smith called the Walnut Ridge police to advise them of the situation as he was making the stop. Walnut Ridge Detective David Burnside arrived at the scene almost immediately.

Smith approached the driver side of the truck, asked for identification, and received driver licenses from both occupants. Bob Castleman was the driver, and Rebecca Spray was the passenger. While requesting identification Smith noticed tubing between the two front seats. When he ran the identification information, Smith discovered that Spray was on probation. He contacted her probation officer who advised him that Spray was subject to search by any law enforcement officer.

Smith then asked Spray to get out of the truck, advised her of her rights, and told her that he had received a report that she bought methamphetamine supplies at the Farm Service store. He saw pills laying on the floor of the truck. Spray stated that she and Castleman were buying "stuff" including fuel and pills to take to Castleman's house for someone else. Spray and Castleman were arrested. A search of the truck found a can of Coleman fuel, four boxes of pseudoephedrine pills, tubing, and a box of plastic bags.

B.

Chief Smith reported information about the traffic stop and arrest of Castleman and Spray to Sheriff Gary Tribble of Randolph County, Arkansas. Based primarily on this information, Sheriff Tribble requested and received a search warrant for Castleman's residence in Imboden, Arkansas. Sheriff Tribble and several other law enforcement officers executed the warrant on April 12, 2011.

Castleman's residence was located on 262 acres of land which was enclosed by a barbed wire fence on three sides, bordered by a river on the fourth, and posted with signs on the boundaries. A locked gate was at the entrance to the property, and law

enforcement officers used bolt cutters to gain access for the search. Bob Castleman's son, Robert Jerrod Castleman ("Jerrod"), was present at the house when officers arrived. Inside the house officers found two lithium batteries, some marijuana, and digital scales. Two Coleman fuel cans and one starter fluid can were found on the rear porch.

While other officers searched the house, investigators Michael King and Willie Kimble followed a driveway that led uphill and away from the residence. Over the crest of the hill in an area not visible from the house, they found closed garbage bags in a trailer. They also noticed a large plastic tarp near some hay bales, and without moving the tarp they could see an air tank and a gray plastic tote under it. The officers opened the trash bags and found a Coleman fuel can and a lacquer thinner can. They then moved the tarp and opened the tote. Inside was plastic and copper tubing, a white spoon, a funnel, pipe and valve fittings, a siphon pump, two plastic pitchers, rubber gloves, drain cleaner, and a pill crusher with residue on it. They also found an empty bag of salt pellets near the tote. King took photos of these items. Subsequent forensic testing detected methamphetamine residue on the digital scales found in the residence and pseudoephedrine residue on the pill crusher found in the tote. The copper tubing found in the tote had green corrosion consistent with exposure to anhydrous ammonia.

C.

A grand jury indicted Castleman on charges of conspiracy to manufacture methamphetamine in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B) and 846; maintaining a drug premises in violation of 21 U.S.C. §§ 856(a)(2) and 846; and conspiracy to possess chemicals and equipment used to manufacture methamphetamine in violation of 21 U.S.C. § 843(a)(6), 843(d), and 846. Other charged members of the conspiracy to manufacture methamphetamine included

Jerrod, Spray, and Travis Perkins. Spray and Castleman were the only charged members of the conspiracy to possess methamphetamine precursors.

Castleman moved to suppress evidence obtained from the traffic stop and from the search of the trash bags and tote. The district court denied these motions. Castleman was the only defendant who proceeded to trial. Travis Perkins was killed shortly before he was scheduled to enter a guilty plea on April 18, 2013. Jerrod pleaded guilty on the day trial began, December 12, 2013. The other coconspirators had already pleaded guilty and agreed to cooperate with the government.

The evidence presented by the government at trial showed that Castleman allowed Jerrod and Perkins to cook methamphetamine on his property in Imboden, Arkansas, that he received methamphetamine for his own use in return, and that he sometimes purchased precursors for them. Evidence and testimony about the traffic stop and search of Castleman's property was also presented, and a forensic chemist testified that methamphetamine could be produced using materials such as lithium batteries, pseudoephedrine pills, anhydrous ammonia, tubing, air tanks, plastic containers, salt, and camp fuel. Records from a state database showed that Castleman had purchased pseudoephedrine pills 14 times in the two years preceding his arrest.

Several witnesses who had agreed to cooperate with the government testified about their visits to the Castleman farm. They testified that they visited the farm between 2008 and 2011, sometimes bringing pseudoephedrine pills with them to give to Jerrod or Perkins for the purpose of manufacturing methamphetamine. Jerrod or Perkins would cook methamphetamine outside of the house and bring the finished product into the house on a coffee filter to dry. The filter would be placed on the kitchen table, sometimes in Castleman's presence. Castleman and others at the farm would then smoke the methamphetamine. Sometimes Perkins would make enough so that they could all smoke some, he could leave some with Castleman, and he could take some away himself. One witness also testified that he, Perkins, Jerrod, and

Castleman talked as a group about purchasing fertilizer. While nobody had stated directly that the fertilizer was for manufacturing methamphetamine, he believed that "everybody knew" that was its purpose.

On the morning of the third day of trial, the government announced that it intended to call Jerrod as a witness and that it had recently learned Jerrod would testify that Castleman had confessed to killing Perkins.[2] The government stated that it wished to offer testimony about this confession as evidence of Castleman's consciousness of guilt of the charged offenses and that it believed a limiting instruction would be appropriate. Castleman objected to the introduction of this evidence and the district court granted the defense a 24 hour continuance to prepare its response.[3] After hearing argument the court ruled that it would allow the testimony for the limited purpose identified by the government.

Jerrod testified that when his father mentioned that he had been "ripped off" and had gotten "bad stuff," which Jerrod understood to be methamphetamine, Jerrod "hinted that [he] might be able to fix the problem." Jerrod knew that his friend Perkins "was cooking meth at the time and he sometimes needed a place to go." Perkins and Jerrod began manufacturing methamphetamine on Castleman's property; according to Jerrod, his father "basically told me he didn't want to know nothing about it." Jerrod confirmed that he and Perkins would receive pseudoephedrine pills from visitors to the property, manufacture methamphetamine on the property, bring

---

[2]The government had learned on the first day of trial that Jerrod was willing to testify, but it explained that before deciding to offer him as a witness it wanted to meet with him to assess his credibility, investigate whether his evidence was corroborated, and assess any risks to his safety as an incarcerated cooperating witness.

[3]Castleman initially moved for a longer continuance in order to investigate the alleged murder. The district court denied this request, a ruling which Castleman did not appeal. The length of the continuance granted is therefore not now at issue.

the methamphetamine on a coffee filter into the house to dry, and then smoke some of it with whomever was present. Castleman was sometimes present when they brought the coffee filter into the house and when they smoked together. Jerrod also testified that Castleman brought him pseudoephedrine pills and that Castleman was concerned "for appearance's sake" about the buggy of fertilizer on his property. The "appearance" problem was because it was commonly known that such fertilizer could be used to make methamphetamine, and Jerrod and Perkins in fact had obtained it for this purpose. Jerrod stated that the tote and air tank found on the property belonged to Perkins and that Castleman was aware of their presence.

Before Jerrod gave his account of Castleman's confession, the district court instructed the jury,

> Members of the jury, . . . in the testimony of this witness, you're about to hear evidence of acts or statements of the defendant. This evidence is received for a limited purpose. You may consider this evidence only as a circumstance tending to show consciousness of guilt of the offense charged in this trial if you so interpret it. You are not to consider this evidence for any other purpose. You are instructed also that the receipt of this evidence does not in any way alter the presumption of innocence and the government's burden of proof beyond a reasonable doubt.

> It is for you, the jury, to determine whether you believe the evidence, and if you do, what weight and significance you accord it as evidence of consciousness of guilt.

This same instruction was used in United States v. Gonsalves, 668 F.2d 73, 74 n.4 (1st Cir. 1982), and a slightly modified version of the same instruction was also part of the final jury instructions in this case.

Jerrod then testified that before Perkins had died, Castleman said that Perkins "had to go." Castleman "was upset with [Perkins] because there was a good chance that he would be testifying." Jerrod later learned that Perkins had been shot and killed, and Castleman told Jerrod "he did it." According to Jerrod, Castleman said that on the night he shot Perkins he went with a woman named Kim to the dog track in West Memphis, left his cell phone with her, and drove back to Pocahontas where Perkins's apartment was located. Wearing a wig and a trench coat, Castleman entered the apartment and found Perkins asleep. Castleman shot Perkins twice with a nine millimeter Glock, and Jerrod thought the shots hit Perkins in the face and chest. Castleman drove away and threw the gun, two clips, the wig, and the trench coat into a river.

FBI Agent Edward Jernigan provided additional evidence about the circumstances of Perkins's death. Perkins had been scheduled to change his plea to guilty on April 18, 2013, and this information was printed in a local newspaper prior to his death. It was anticipated that he would cooperate with the government, and he and Jerrod would have been the two most important witnesses in the case. His body was found on April 15. Perkins was lying in his bed, and there was a gunshot wound near his nose. Two spent nine millimeter casings which could have been fired from a Glock were found in the apartment.

Castleman did not present any evidence in his defense. The jury returned a guilty verdict on all three counts after a few hours of deliberation.

D.

The presentence investigation report calculated that Castleman's base offense level for the conspiracy to manufacture methamphetamine conviction would be 26 based on drug quantity, with a total offense level of 34 after certain recommended enhancements were added. See U.S.S.G. § 2D1.1(c)(7). The sentencing guidelines

however provide that the base offense level of 43 applies "[i]f a victim was killed under circumstances that would constitute [first degree] murder under 18 U.S.C. § 1111 had such killing taken place within" federal jurisdiction. U.S.S.G. §§ 2A1.1, 2D1.1(d)(1). The presentence investigation report recommended applying this higher offense level, and Castleman objected.

At sentencing the government supplemented the trial testimony by offering additional evidence to prove that Castleman murdered Perkins. Kim Caudle testified about her trip to the West Memphis dog track with Castleman on the evening of Saturday, April 13, 2013 and early morning of the next day. She and Castleman left for the track around 10 p.m., and she drove because "he was a little messed up on Xanax[] and meth." After they arrived at the track Castleman went in, gave her some money and his cell phone, and left. His reason for leaving the phone was so that Caudle could make some calls to Jerrod, whom she was then dating, without using up her cell phone minutes. Phone records showed that the signal from Castleman's cell phone bounced off the West Tennessee tower from 12:14 a.m. until 10:32 a.m. on April 14, indicating that the phone was located at the dog track throughout that time.

Caudle did not see Castleman again until after 4 a.m. Remembering that she had not yet contacted Jerrod, Caudle called him. Caudle estimated that Castleman was gone for three or four hours and she thought that would be long enough for him to get to Pocahontas and back. Phone records showed calls made from Castleman's phone to Jerrod's phone at 12:14 a.m. and 4:40 a.m., and a purchase was made using Castleman's credit card at 4:47 a.m. Caudle stated that Castleman did not leave his credit card with her. Regarding Castleman's ability to drive that night after taking both Xanax and methamphetamine, Caudle said that he had been in car wrecks while under the influence of Xanax, a depressant. She did not say how methamphetamine, a stimulant, typically affected Castleman's driving.

Agent Jernigan testified that Jerrod had described the route Castleman claimed to have taken from the dog track to Pocahontas and back. Castleman had reportedly passed through Blytheville and Corning, Arkansas on the way there and through Old Davidsonville State Park and Black Rock, Arkansas on the way back. On cross examination, the defense questioned Jernigan about the amount of time this route would take. An estimate based on entering these locations into MapQuest was that the entire trip would have taken about five hours, but phone records indicated that Castleman had only been gone from the dog track for about four and one half hours. Jernigan stated that such travel time estimates are based on traveling the speed limit and that he could not know whether Castleman was speeding or how much.

At the sentencing hearing Jernigan also expanded on his trial testimony related to Castleman's motive for murdering Perkins. He testified that Perkins had given a proffer to the government before he was killed and that it was expected he would testify against Castleman. Castleman was aware of Perkins's expected cooperation because he was quoted in a newspaper as saying "he had learned that all except one of his codefendants intends to plead guilty and presumably will testify." Perkins would have testified that he cooked methamphetamine on the porch of the Castleman residence three or four times when Jerrod was not present. As additional corroboration of Jerrod's trial testimony, Agent Jernigan also noted that the location and number of Perkins's wounds (one near the nose and one through his body) and the type of weapon used had not been made public. Statements from a friend of Perkins showed that Perkins could have been killed in the early morning of Sunday, April 14, 2013. The friend had last seen Perkins at 11 or 11:30 p.m. on Saturday, April 13 and received no answer when he knocked at Perkins's door at 8:00 a.m. on Sunday.

Jerrod was not the only person with whom Castleman discussed killing Perkins. Doyle Esmon testified that Castleman had told him "that he took care of business" and had described going to the track with Kim Caudle, leaving to go to Pocahontas,

and shooting Perkins twice in the bedroom of his apartment. Esmon thought Castleman was bragging to get attention and did not believe him at the time. Esmon also testified that he had sold Castleman a nine millimeter Glock handgun in 2010. That was the type of gun which Jerrod had asserted was used in the murder. Forensic analysis of bullets found at the scene of Perkins's murder and lodged in a tree on the Castleman farm showed that they could all have been fired from a nine millimeter Glock, but comparisons of the bullets to determine whether they were all fired from the same gun were inconclusive. Shell casings found at both locations were made by Sellier & Bellot, which a crime lab expert testified was a relatively uncommon manufacturer.

Based on this evidence and the evidence presented at trial, the district court found that the government met its burden of proving that Castleman had killed Perkins under circumstances which would constitute first degree murder. Although Castleman had argued that the government would have to prove this fact by clear and convincing evidence, the district court determined that the proper burden was a preponderance of the evidence under United States v. Villareal-Amarillas, 562 F.3d 892 (8th Cir. 2009). The court noted that the guideline range would be life, but the applicable statutory maximum would be 64 years if Castleman were to serve consecutive sentences for all three counts. Weighing the relevant factors under 18 U.S.C. § 3553(a), the district court sentenced Castleman to concurrent sentences of 480 months for the conspiracy to manufacture methamphetamine, 240 months for maintaining a drug premises, and 48 months for conspiracy to possess chemicals and equipment used to manufacture methamphetamine. Castleman appeals.

II.

A.

Castleman argues that the district court erred in denying his motion to suppress evidence obtained from the traffic stop on April 11, 2011. We "review the denial of a motion to suppress de novo and the underlying factual determinations for clear error." United States v. Henley, 766 F.3d 893, 911 (8th Cir. 2014). Castleman acknowledges that Hoxie Police Chief Smith had probable cause to stop him for a minor traffic violation, but he claims that Smith lacked authority under state law to make an arrest in Walnut Ridge for Castleman had not committed a felony or misdemeanor in Smith's presence. See Ark. Code Ann. § 16-81-106(c). He argues that this seizure violated the Fourth Amendment under the nine factor test applied in United States v. Atwell, 470 F. Supp. 2d 554 (D. Md. 2007).

Even if Arkansas law did not give Chief Smith authority to stop Castleman's truck in Walnut Ridge, a seizure in violation of state law does not necessarily offend the Fourth Amendment. In Virginia v. Moore, 553 U.S. 164, 166-67, 176 (2008), the Supreme Court determined that officers had not violated the Fourth Amendment when they arrested Moore for driving with a suspended license instead of issuing him a summons, as would have been proper under Virginia law. The Court explained that "when an officer has probable cause to believe a person committed even a minor crime in his presence, the balancing of private and public interests is not in doubt. The arrest is constitutionally reasonable." Id. at 171. States may provide additional protections under their laws, but "a warrantless arrest satisfies the Constitution so long as the officer has probable cause to believe that the suspect has committed or is committing an offense." Id. at 173 (quotation omitted).

Applying Moore, we determined in Rose v. City of Mulberry, Arkansas, 533 F.3d 678, 680 (8th Cir. 2008) that no Fourth Amendment violation occurred when an

Arkansas officer had probable cause to make a traffic stop and arrest but lacked authority under state law. The constitutional standard is probable cause, not a multifactor test balancing various interests and circumstances. Id. Here, Chief Smith similarly had probable cause to stop Castleman and there was thus no Fourth Amendment violation. The district court properly denied the motion to suppress evidence obtained as a result of this seizure.

B.

Castleman also appeals the district court's denial of his motion to suppress evidence obtained from searching the tote and trash bags located on his property. The parties agree that these items were in an open field. Fourth Amendment protections for people in their "persons, houses, papers, and effects" do not "extend[] to the open fields," and individuals have "no legitimate expectation that open fields will remain free from warrantless intrusion by government officers." Oliver v. United States, 466 U.S. 170, 176, 181 (1984) (quotations omitted). Police officers thus may "enter and search a[n open] field without a warrant." Id. at 173.

Although the trash bags and tote were visible in an open field, Castleman argues that the search of their *contents* nonetheless violated his Fourth Amendment rights. In order to have standing to challenge the search of these items, Castleman must have had a subjective expectation of privacy in these containers which was objectively reasonable. United States v. Stallings, 28 F.3d 58, 60 (8th Cir. 1994). Assuming that Castleman had a subjective expectation of privacy, the district court determined that this expectation was not objectively reasonable. We review this legal determination de novo. United States v. Douglas, 744 F.3d 1065, 1069 (8th Cir. 2014).

In Stallings, the defendant had left a tote bag (zipped shut) in an open field. 28 F.3d at 59. Nothing about the tote bag appeared suspicious, but officers found

-13-

drug paraphernalia inside when they opened it.  Id.  We determined that "any expectation of privacy Stallings had [was] not objectively reasonable . . . because 'animals, children, scavengers, snoops, and other members of the public' had access to the tote bag" and the defendant did not show he had sought to preserve the bag as private.  Id. at 61, quoting California v. Greenwood, 486 U.S. 35, 40 (1988).  There, a "theoretical possibility" that any such animals or persons could access the item "was sufficient to make a defendant's expectation of privacy unreasonable."  Id., citing Wabun-Inini v. Sessions, 900 F.2d 1234, 1242 (8th Cir. 1990).

Castleman claims that Stallings is distinguishable because unlike the defendant in that case he owned the property and controlled access to it via a locked gate, fences, and signs posted at the boundaries.  It is clear that the differences Castleman identifies did not create a legitimate expectation of privacy in the field itself.  Property ownership and efforts to control access to the area are not enough to create an objectively reasonable expectation of privacy in open fields.  Oliver, 466 U.S. at 179, 183.  Law enforcement officers thus had the ability to access the open field where the tote and trash bags were found regardless of the gate, fences, and signs on Castleman's property.  Other people could have also come across these items in the field.  Open fields are "as a practical matter . . . accessible to the public and the police in ways that a home, an office, or commercial structure would not be" and "[i]t is not generally true that fences or 'No Trespassing' signs effectively bar the public from viewing open fields in rural areas."  Id. at 179.  Since the gate, fences, and signs on the Castleman property did not afford him a reasonable expectation of privacy, they do not add significant support to his claim of a reasonable expectation of privacy in the tote and trash bags found on his property.  Any differences between the open fields in this case and in Stallings are therefore not material.

Moreover, the record here does not show that Castleman took steps to preserve the privacy of the trash bags and tote.  As in Stallings, those items bore no indicia of ownership and Castleman "put on no evidence of his possession or control of the bag,

-14-

his historical use of the tote bag, or his ability or attempts to regulate access to it." 28 F.3d at 60-61. These factors prevented a showing of an objectively reasonable expectation of privacy in Stallings despite the bag being left in an open field because the owner "failed to show how he sought to preserve the tote bag as private." Id. at 61; see also Douglas, 744 F.3d at 1070-72. Here, Castleman has similarly not shown that he controlled, used, or attempted to restrict access to the tote and trash bags.

Our decision in United States v. Pennington, 287 F.3d 739 (8th Cir. 2002) further supports the denial of Castleman's suppression motion. In Pennington, officers in an open field observed "a ventilation pipe protruding from the ground [and] a wooden pallet covering an entryway" to something underground. Id. at 745. When they moved the pallet, they saw a ladder going down into a tunnel; inside the tunnel was equipment used to manufacture methamphetamine. Id. We determined that a warrantless search of this underground bunker did not violate the Fourth Amendment given its location "in an open field, its readily visible entryway with an unprotected ladder facilitating access to the tunnel, and no lock or door impeding access." Id. at 746. Here, the trash bags and tote were visible in the open field and they were not inside any building or structure. Although the tote was covered with a lid, just as a wooden pallet covered the entrance to the bunker in Pennington, there was no lock or surrounding structure preventing anyone present in the field from opening it.

Because Castleman did not show that any expectation of privacy he had in the trash bags and tote was objectively reasonable, the district court did not err in denying his motion to suppress evidence obtained from searching these items.

C.

On appeal Castleman renews his challenge to the admission of trial testimony about the murder of Perkins. Castleman argues that this evidence should have been

-15-

excluded under Federal Rule of Evidence 403 because its limited probative value was outweighed by the danger of unfair prejudice. Rule 403 provides in part, "The court may exclude relevant evidence if its probative value is substantially outweighed by . . . unfair prejudice." We give "great deference" to the district court's "balancing of the relative value of a piece of evidence and its prejudicial effect" under this rule and we reverse only if there was a "clear abuse of discretion." United States v. Zierke, 618 F.3d 755, 759 (8th Cir. 2010) (quotation omitted); United States v. Bell, 761 F.3d 900, 912 (8th Cir. 2014) (quotation omitted).

Several Eighth Circuit cases have determined that "'evidence of death threats against witnesses . . . is generally admissible against a criminal defendant to show consciousness of guilt of the crime charged.'" Zierke, 618 F.3d at 759, quoting United States v. DeAngelo, 13 F.3d 1228, 1232 (8th Cir. 1994); see, e.g. United States v. Mondano-Gudino, 309 F.3d 501, 505 (8th Cir. 2002); United States v. Nunn, 940 F.2d 1128, 1130-31 (8th Cir. 1991). Such evidence is considered "direct evidence of the crime charged" and is not subject to a Rule 404(b) analysis. Zierke, 618 F.3d at 759 (quotation omitted). If the district court has given an appropriate limiting instruction, "this court has been reluctant to hold that evidence was unfairly prejudicial." Id. (quotation and alteration omitted).

Castleman acknowledges our cases involving death threats against witnesses, and he does not challenge the limiting instruction given by the district court. He argues however that his case is different from death threat cases because Jerrod testified about a completed homicide. He relies on United States v. Weir, 575 F.2d 668, 671 (8th Cir. 1978), in which we reversed a conviction because evidence of an attempt to kill an informant should not have been admitted under Rule 403. Castleman argues that Jerrod's testimony had little probative value but was highly inflammatory because it portrayed Castleman as a cold blooded killer. He claims that as in Weir, the effect of the testimony was to show the jury that he was a "bad" man who "should be convicted because [he was] 'bad.'" Id. at 672.

-16-

Weir differs in several ways from Castleman's case. The district court in Weir had initially determined that the attempted murder evidence should be excluded under Rule 403 before later changing its ruling despite "obvious misgivings." 575 F.2d at 670-71. As a result, the ordinary "rule of deference [wa]s not decisive." Id. at 670. The contested evidence in Weir was introduced to explain why witness Jackson had stayed at defendant Davis's house to hide and ultimately showed how Jackson had been able to identify Davis. Id. Reviewing the decision on appeal, we stated the explanation needed for this identification "could have been offered into evidence, by appropriate questions, without going into the objectionable [attempted murder] evidence." Id. at 671. Statements by the prosecutor in Weir "appear[ed] to be calculated to enhance the effect of the [attempted murder] evidence on the jury in suggesting an improper basis for a verdict of guilty," heightening the unfair prejudice, and it is unclear whether the jury received any limiting instruction related to the contested evidence. Id.

Unlike in Weir, the district court here did not change its ruling on the admissibility of Jerrod's testimony. This evidence was received to show consciousness of guilt, not to explain the context for an identification. The jury received an appropriate limiting instruction and the prosecution did not make any suggestion that the jury should convict on an improper basis. These differences are significant, and Weir does not control here.

Giving appropriate deference to its balancing under Rule 403, we cannot say that the district court committed a clear abuse of discretion. Testimony by Jerrod and Agent Jernigan was highly relevant to consciousness of guilt.[4] Perkins had planned to change his plea to guilty and to cooperate with the government, Castleman was

---

[4]The dissent suggests that the government should have shown why this testimony was *necessary*. But the standard for admitting such evidence is *relevance*. Fed. R. Evid. 402.

-17-

aware of these circumstances, and he "was upset with [Perkins] because there was a good chance that he would be testifying" and stated that he "had to go." At trial the government elicited sufficient details from Jerrod and Agent Jernigan to make the account of Perkins's murder believable, but it did not embellish the evidence through unnecessary and unduly prejudicial details.[5] Moreover, Castleman raises no complaints about the prosecutors' statements or arguments at trial. Castleman admits that the evidence as a whole was legally sufficient to support all three convictions, and the jury was properly instructed regarding the value of the consciousness of guilt evidence. Under these circumstances, it was within the district court's discretion to determine that the probative value of the contested evidence outweighed the danger of unfair prejudice under Rule 403.

D.

Castleman appeals the district court's determination at sentencing that he killed Perkins under circumstances that would constitute first degree murder under 18 U.S.C. § 1111 if committed within federal jurisdiction. He first challenges the preponderance of the evidence standard of proof applied by the district court. Our precedent establishes that this was the correct standard. United States v. Villareal-Amarillas, 562 F.3d 892, 895 (8th Cir. 2009).

Castleman also argues that even under a preponderance of the evidence standard the government failed to meet its burden of proof. We review the district court's factual findings at sentencing for clear error. United States v. Spotted Elk, 632 F.3d 455, 458 (8th Cir. 2011). The evidence showed that Perkins was killed between 11 p.m. on Saturday, April 13, 2013, when he was last seen alive, and Monday, April

___

[5]Our cases illustrate that murder is frequently used "to enforce the rules of the [drug trafficking] business." United States v. Dierling, 131 F.3d 722, 730-31 (8th Cir. 1997); see also United States v. Clay, 579 F.3d 919, 924-25 (8th Cir. 2009).

15, when his body was found. He was likely dead by Sunday morning when he did not answer a friend's knock at the door. Cell phone records and Caudle's testimony indicated that Castleman was gone from the dog track for about four and one half hours in the early morning of Sunday, April 14. Jerrod testified that his father had confessed to driving from the dog track to Pocahontas, shooting Perkins in the face and chest with a nine millimeter Glock, and returning to the dog track. The information Jerrod knew about the number and location of Perkins's wounds and the type of weapon used was not publicly available. Testimony from Jerrod and Agent Jernigan showed that Castleman had a motive to kill Perkins because he feared Perkins would testify against him in this criminal case.

Notwithstanding this evidence, Castleman claims that the government could not meet its burden of proof. He first points to the lack of physical evidence connecting him directly to the crime scene. Although ballistics experts could not determine whether the bullets used to kill Perkins were fired from the same gun used at the Castleman property, the same uncommon type of shell casings were found in both locations and there was evidence that Castleman owned the type of gun used to commit the murder. Castleman also argues that it would have been impossible for him to travel from the dog track to Pocahontas and back because the trip was estimated to take five hours, not four and one half hours, and because he had taken Xanax which was known to impair his driving. The five hour round trip estimate offered by the defense was based on driving the speed limit, and Castleman could have been speeding. Caudle testified that Castleman had taken both Xanax and methamphetamine earlier in the evening, and it was not clear whether he was still under the influence of both substances when he left the dog track or how the combination of a depressant and a stimulant would affect his ability to drive.

Taking into account all the evidence presented, the district court did not clearly err in finding that Castleman murdered Perkins in a manner that was "willful, deliberate, malicious, [or] premeditated," 18 U.S.C. § 1111, a finding that was

-19-

necessary to apply a higher base offense level under U.S.S.G. §§ 2A1.1 and 2D1.1(d)(1).

III.

For these reasons, the judgment of the district court is affirmed.

COLLOTON, Circuit Judge, concurring.

I join the opinion of the court and add this observation about the dissenting opinion's reliance on *United States v. Pennington*, 287 F.3d 739, 745 (8th Cir. 2002). The dissent cites *Pennington* to establish that a warrantless search of a "man-made enclosure" found in an open field is "prohibited." The dissent then reasons that *Pennington*'s analysis of the Fourth Amendment as applied to a man-made enclosure should also apply to a tote in an open field.

The dissent accurately characterizes *Pennington*, but *Pennington* based its *dicta* on a misreading of *United States v. Dunn*, 480 U.S. 294 (1987), which involved the observation of items located in a barn in an open field. *Dunn* did not resolve that a property owner has a reasonable expectation of privacy in a man-made enclosure located in an open field. *Dunn* said merely that "[w]e may accept, *for the sake of argument*, respondent's submission that his barn enjoyed Fourth Amendment protection and could not be entered and its contents seized without a warrant." 480 U.S. at 303 (emphasis added). The Court, again referring to the barn, said that its conclusion was unaffected by "the fact that the objects observed by the officers lay within an area that *we have assumed, but not decided*, was protected by the Fourth Amendment." *Id*. at 304 (emphasis added). The Court simply did not decide whether a barn in an open field is protected by the Fourth Amendment. *See also Cady v. Dombrowski*, 413 U.S. 433, 449-50 (1973) ("We . . . need not reach the question . . .

-20-

whether a search of the back seat of this car, located as it was in an open field, required a search warrant at all.").

To reason that a tote in an open field is protected by the Fourth Amendment because a man-made enclosure is protected, one must first address whether a man-made enclosure is protected. That question is not without difficulty. The Fourth Amendment protects the right of the people to be secure in their "persons, houses, papers, and effects," and the Supreme Court has taken a textual approach when considering application of the Amendment to open fields. *See Oliver v. United States*, 466 U.S. 170, 176-77 & n.6 (1984); *Hester v. United States*, 265 U.S. 57, 59 (1924). At common law, "no distant barn, warehouse, or the like" was "under the same privileges" as a private house. *See* 4 William Blackstone, Commentaries *225 (cited in *Hester*, 265 U.S. at 59). If a man-made enclosure such as a barn is therefore not a "house," and if it is not an "effect" (because "[t]he Framers would have understood the term 'effects' to be limited to personal, rather than real, property," *Oliver*, 466 U.S. at 177 n.7), then it would take some work to address whether the Fourth Amendment nonetheless applies to the search of a barn in an open field. *Compare, e.g.*, *People v. Pitman*, 813 N.E.2d 93, 105-07 (Ill. 2004) *with id*. at 110-14 (Thomas, J., dissenting); *cf. See v. City of Seattle*, 387 U.S. 541, 543 (1967) (applying the Fourth Amendment to commercial premises); Thomas Y. Davies, *Recovering the Original Fourth Amendment*, 98 Mich. L. Rev. 547, 711 (1999) (concluding that the textual formulation "implied that 'houses' were the only type of premises protected by the right to be secure"). It is not sufficient to construe an analytical assumption from *Dunn* as a rule of law.

In the end, whether or not a barn or other man-made enclosure in an open field is protected by the Fourth Amendment is not dispositive in this case. The trash bags and tote may be among Castleman's "effects," but where and how personal property is maintained bears on the extent to which the Fourth Amendment protects the owner. *See Katz v. United States*, 389 U.S. 347, 361 (1967) (Harlan, J., concurring) ("'[T]he

-21-

Fourth Amendment protects people not places.' The question, however, is what protection it affords to those people. Generally, as here, the answer to that question requires reference to a 'place.'"); *cf. United States v. Thomas*, 864 F.2d 843, 845 (D.C. Cir. 1989) ("[I]t is possible for a person to retain a property interest in an item, but nonetheless to relinquish his or her reasonable expectation of privacy in the object."). For reasons given in the opinion of the court, I agree that the search of trash bags and a tote in an open field did not violate the Fourth Amendment under the circumstances presented here.

KELLY, Circuit Judge, concurring in part, dissenting in part.

I concur in the court's opinion as to part IIA. I respectfully dissent, however, from part IIB. As the court notes, the parties agree that the plastic bags and tote that were the subject of the warrantless search were located in an open field. See Oliver v. United States, 466 U.S. 170, 178–79 (1984). I agree with the court that the containers searched were in plain view to law enforcement. The question on appeal is whether Bob Sam Castleman had an objectively reasonable expectation of privacy in these closed containers.[6] The court concludes he did not. With respect to the tote, I believe he did.[7]

---

[6]The district court and this court on appeal have assumed Castleman had a subjective expectation of privacy in the bags and tote searched. I have done the same.

[7]The containers seized and searched included full plastic trash bags and a hard-sided plastic tote. I recognize that plastic trash bags are sometimes used for storage of items a person wants to save, not discard. Thus, in some situations, a person may be able to show a subjective expectation of privacy in a closed plastic trash bag, and that expectation may be objectively reasonable. In this case, however, there is no indication that the plastic bags were anything but full of trash. I therefore concur in the court's conclusion that Castleman failed to meet his burden of proving that any expectation of privacy he may have had in discarded trash was objectively reasonable.

-22-

Law enforcement officers are required to obtain a warrant or otherwise have constitutional justification to access the contents of a closed container, even if the officer is lawfully present where the closed container is found. See United States v. Banks, 514 F.3d 769, 773–74 (8th Cir. 2008) ("Ordinarily, a warrant is necessary before police may open a closed container because by concealing the contents from plain view, the possessor creates a reasonable expectation of privacy."). There are exceptions, of course. One such exception is that law enforcement "may seize, without a warrant, an item that is (1) in plain view, (2) when it is observed from a lawful vantage point, (3) where the incriminating character of the item is immediately apparent." Id. The tote in this case, however, was not incriminating in and of itself, and there was nothing externally visible to indicate the containers held evidence of a drug manufacturing operation. See id. at 775 (finding the search of a gun case without a warrant constitutionally acceptable, as the container was readily identifiable as a single-purpose container—namely, a gun case). Thus, while the officers were lawfully in the open field when they observed the tote, there was nothing about the tote itself that suggested the owner did not have a reasonable expectation of privacy in its contents. See id.

The tote was found on Castleman's own 262-acre parcel of property, which is an important factor in determining whether his expectation of privacy in a closed container found there was objectively reasonable. Cf. United States v. Douglas, 744 F.3d 1065, 1070 (8th Cir. 2014) (holding the defendant failed to demonstrate an objectively reasonable expectation of privacy over items found on his aunt and uncle's property); United States v. Stallings, 28 F.3d 58, 61 (8th Cir. 1994) (stating the defendant did not have an objectively reasonable expectation of privacy in items he had left unattended on someone else's property). Castleman also took efforts to restrict access to his property with barbed-wire fences, a locked gate, and "No Trespassing" signs. Cf. Douglas, 744 F.3d at 1070 (holding the defendant failed to demonstrate his expectation of privacy was reasonable, as he had not attempted to regulate access to the bag beyond generally demanding the officers leave his aunt and

uncle's property). While fences, gates, and "No Trespassing" signs do not "effectively bar the public from viewing open fields in rural areas," and thus cannot establish a reasonable expectation of privacy in an open field, Oliver, 466 U.S. at 178–79, those same fences, gates, and signs are relevant when determining whether an expectation of privacy in items in that open field is objectively reasonable. Cf. Stallings, 28 F.3d at 60 n.3 ("[T]he fact that the bag was left in an open field owned by another is highly relevant, as a factual matter, in demonstrating the reasonableness of [the defendant's] expectation of privacy.").

Castleman also did not place the containers in a location where he expected they would be taken or accessed by a third party. Cf. California v. Greenwood, 486 U.S. 35, 40 (1988) (finding the respondents did not manifest a reasonable expectation of privacy in the garbage bags left on or near the public street, as they placed the bags on the curb "for the express purpose of conveying it to a third party"—namely, trash collectors). The tote in this case was found approximately 200 yards from Castleman's house, and not near the road or driveway leading to his home where visitors might frequent. Although the tote was visible to law enforcement during a search of the open fields, it was mostly covered by a plastic tarp. Castleman had both partially protected the tote from the elements and largely shielded it from the view of potential passers-by.

The court relies in part on United States v. Pennington, 287 F.3d 739 (8th Cir. 2002), to support the conclusion that Castleman lacked an objectively reasonable expectation of privacy in the tote. In Pennington, we found no error in the district court's denial of Pennington's motion to suppress items found in an underground bunker located in an open field on his property. Yet the court made it clear that "the open fields doctrine only allows a search of what is in plain view in the open field. It does not justify a warrantless search of a man-made enclosure found in an open field." Pennington, 287 F.3d at 745. Recognizing the important distinction between a warrantless search of a man-made enclosure (prohibited) and a warrantless search

-24-

of "what is in plain view in the open field" (permissible), <u>Pennington</u> presented the court with "a very close issue." <u>Id.</u> Only the facts that the entrance to the underground bunker was "readily visible" with an "unprotected ladder facilitating access to the tunnel" and "no lock or door impeding access" to that entrance rendered the warrantless search permissible. <u>Id.</u> at 746.

The reasoning we applied with regard to a "man-made enclosure" in <u>Pennington</u> should, in my view, also apply to the tote. A man-made enclosure may be in plain view in an open field, but law enforcement is not permitted to search that enclosure without a warrant, even if officers are lawfully in the open field in the first instance. <u>See</u> <u>id.</u> at 745. Similarly, the tote itself was in plain view in an open field—and law enforcement lawfully observed it there—but its contents were not. The tote was opaque plastic and the lid was closed, thereby completely concealing the contents from view. Law enforcement was therefore required to obtain a warrant before searching the tote.

The fact that a closed container is located in an open field does not mean a person has abandoned any objectively reasonable expectation of privacy in its contents. Instead, such circumstances require a fact-specific inquiry. <u>See, e.g.</u>, <u>Douglas</u>, 744 F.3d at 1070–72; <u>Stallings</u>, 28 F.3d at 61. In my view, the facts of this case present a close call, but the evidence presented in this case was enough to establish a reasonable expectation of privacy. The contents of the tote were not visible or readily ascertainable by sight, and the tote itself was mostly covered by a tarp. The tote, a common type of storage bin for personal items, was located on property owned by Castleman, and that property was fenced, had a locked gate, and had posted "No Trespassing" signs. Because Castleman took minimally sufficient steps to preserve the tote as private, I conclude he had an expectation of privacy in the tote that society is prepared to recognize as objectively reasonable.

-25-

I also respectfully dissent from part IIC of the court's opinion. I agree that evidence of threats, including death threats, may be admissible to illustrate "consciousness of guilt." See United States v. Zierke, 618 F.3d 755, 759 (8th Cir. 2010). In some cases, it may be probative of guilt of the charged offense. Id.; see also United States v. Burnett, 579 F.3d 129, 133 (1st Cir. 2009) (holding that evidence of a death threat may be introduced for a purpose "such as demonstrating consciousness of guilt by showing the lengths to which a defendant will go to keep damaging testimony out of his trial"). On this issue, I do not disagree with the court. Yet even probative evidence may be inadmissible if the prejudicial effect of that evidence substantially outweighs its probative value. United States v. Weir, 575 F.2d 668, 671 (8th Cir. 1978). In my view, the danger of unfair prejudice from introduction of the disputed evidence—that Castleman not only threatened a government witness, but in fact carried out that threat by murdering him—substantially outweighs its probative value. See FED. R. EVID. 403.

When considering the admissibility of a threat, there are several relevant factors to consider in determining whether the danger of unfair prejudice outweighs the probative value. These factors may include (1) whether the threat was "an emotional or impulsive reaction" as opposed to a calculated or premeditated plan to carry out the threat; (2) whether the jury heard "graphic details of how the threat would be carried out"; and (3) the inflammatory nature of the threat. Burnett, 579 F.3d at 134.

First, this case did not merely involve an emotional or impulsive threat. Rather, it also involved evidence of a premeditated murder carrying out that threat. Evidence that Castleman told his son, Jerrod Castleman, that Travis Perkins "had to go" may have been an impulsive statement or threat; the record offers little more than the statement itself, so it is difficult to know. Yet even if this threat was made on impulse, the evidence presented at trial did not stop there. Instead, the government introduced evidence of a calculated murder. Specifically, Jerrod testified that his

-26-

father left his cell phone behind and drove from West Memphis, where he had been at the dog track, to the small town of Pocohontas, where Perkins lived. He then went to Perkins's apartment wearing a wig and a trench coat, walked into Perkins's bedroom, and shot Perkins in the face and chest with a handgun before disposing of the gun, holster, two clips, wig, and trench coat in the river. Rather than hearing about a simple, impulsive threat, the jury heard evidence of a murder and attempted cover-up, thus increasing the risk of an unfair prejudicial effect. Cf. id. (holding the threat was merely an impulsive reaction, which supported the district court's decision to allow the evidence).

Second, instead of hearing how the threat *would be* carried out, the jury heard how the threat *was in fact* carried out by Castleman. And the government's case agent—after already testifying in the government's case-in-chief—was recalled to the witness stand to corroborate some of the details Jerrod provided, testifying that Perkins's "feet and legs were hanging off the side of the bed . . . as if either he was about to get up or had just laid down, one or the other, when he had been killed." The agent also confirmed Perkins was shot in "the nasal area" and that there were two shell casings found on the floor near the body. These details, amounting to far more than a mere threat showing a consciousness of guilt, provided the jury with a graphic description of an actual murder of a government witness by Castleman. Cf. id. (In weighing the probative value of death threat against danger of unfair prejudice, we consider, among other things, "whether the jury heard graphic details of how the threat would be carried out.").

Third, the evidence in this case—evidence of a murder of a government witness, presented unexpectedly in the middle of a drug conspiracy trial—was inflammatory in nature, thereby adding to its prejudicial impact. See id. ("We accept that Burnett's threat was inflammatory because it was aimed at [the witness's] daughter."); see also United States v. McManaman, 606 F.2d 919, 926 (10th Cir. 1979) ("[H]earing and reading the taped conversation lead us to the conviction that

the inflammatory talk of the plans of murders clearly must have predominated in impact over the discussion of drug dealings."). Even if probative of guilt, there was a substantial risk that this evidence improperly "divert[ed] the jury's attention from the material issues in the trial." United States v. Fawbush, 634 F.3d 420, 423 (8th Cir. 1990) (concluding other-act evidence that defendant had sexually abused his daughters and fathered a child with one of them was so inflammatory that it diverted the jury's attention and should have been excluded under Rule 403). The material issues at Castleman's trial included whether he voluntarily and intentionally joined a conspiracy to manufacture methamphetamine and whether he voluntarily and intentionally allowed other individuals to use his property to manufacture methamphetamine. Then, on the third day of trial, the jury heard from Castleman's son that Castleman had also committed murder. Murder is a type of crime quite different in kind and quality than drug trafficking, and it is difficult to imagine that this evidence did not change the tone, tenor, and focus of the trial.[8]

Another relevant factor for consideration in this case is the government's delay in filing its notice of its intent to offer evidence of the murder until the morning of the third day of trial. Trial started on Thursday; on the following Monday morning, the government said they "learned on Thursday morning of last week about this information, but [we] did not have a chance to talk directly with Mr. Jerrod Castleman about the information."[9] The district court allowed the evidence and granted a one-

---

[8]While not a dispositive factor, courts have considered "the Government's need for the evidence" to prove its case at trial. See Burnett, 579 F.3d at 134; United States v. Check, 582 F.2d 668, 685 (2d Cir. 1978) (noting that, due to the "severe prejudice [that] can result from the use of death threat testimony . . . we have carefully limited that use to situations where there was a clear need for the prosecution to use such evidence"). The government did not explain why the consciousness of guilt evidence in this case was necessary.

[9]The government also stated that "Jerrod Castleman's safety" "played into the timing" of the filing of the notice of intent to offer additional evidence, although it

day continuance. The evidence was presented the following day.[10] Thus, any "danger of unfair prejudice" was exacerbated because Castleman, as a practical matter, had no opportunity to investigate or prepare a meaningful defense to this new, highly damaging consciousness of guilt evidence. And, as a result, the jury was left with only the government's version of events. Perhaps Castleman would not have been successful, even with additional time, in presenting an alternative explanation or lodging a credible defense to the murder allegation. As it happened, however, he was not given an opportunity.

Federal Rule of Evidence 403 "does not offer protection against evidence that is merely prejudicial in the sense of being detrimental to a party's case. The rule protects against evidence that is unfairly prejudicial, that is, if it tends to suggest decision on an improper basis." United States v. Myers, 503 F.3d 676, 681–82 (8th Cir. 2007) (quotation omitted); see also FED. R. EVID. 403 advisory committee's note (explaining that unfair prejudice "means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one"). In this case, the danger of *unfair* prejudice was simply too strong. Without notice prior to trial, the government introduced evidence not only that Castleman had made a threat against a government witness, but that he had in fact carried through on that threat and violently murdered that witness prior to trial. See Burnett, 579 F.3d at 133 (While evidence that defendant threatened to kill a witness pre-trial may be admissible to show consciousness of guilt, "[s]uch evidence can be highly prejudicial . . . and it should not be admitted if its probative value is substantially outweighed by the danger of unfair prejudice." (quotation omitted)). It is unrealistic, and unfair, to

_____

did not elaborate on this concern.

[10]Keep in mind, too, that jury selection would not have filtered any individual venire members who might have expressed a real concern about sitting on a jury at a trial where evidence of a murder would be introduced and who, as a result, could not be fair and impartial.

expect a jury to compartmentalize this accusation into the category of "consciousness of guilt" and "not to consider this evidence for any other purpose." See Instruction No. 17. The risk that the jury would render its decision "on an improper basis" under these circumstances is unacceptably high.

I recognize that the district court gave a limiting instruction in this case, both at the time of the testimony and again in the final instructions read to the jury. I also recognize the deference properly given to district courts who must make difficult evidentiary decisions during the course of a trial. I believe, however, the probative value of the evidence that Castleman murdered a co-conspirator prior to trial was substantially outweighed by the danger of unfair prejudice and should have been excluded. See Weir, 575 F.2d at 670–71. On this issue, I respectfully dissent.

Because the error in admitting the testimony about Castleman's alleged murder of Perkins was not harmless, I would reverse the conviction on that grounds. I therefore would not reach the sentencing issues addressed in part IID.

_____